592 A.2d 1176

CAROL ANN FELDMAN, PLAINTIFF–APPELLANT, v. LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID COMPANY, A MAINE CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

Argued January 14, 1991—Decided July 24, 1991.

*James I. Peck, IV,* argued the cause for appellant.

*William C. Slattery* argued the cause for respondent (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski* and *Norris, McLaughlin & Marcus,* attorneys; *Mr. Slattery* and *James L. Melhuish,* of counsel).

*Marc S. Klein* argued the cause for *amici curiae* Pharmaceutical Manufacturers Association and E.R. Squibb & Sons, Inc. (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys).

*John L. McGoldrick* submitted a brief on behalf of *amicus curiae* Eli Lilly and Company (*McCarter & English,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

In *Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 479 *A.*2d 374 (1984) (*Feldman* I), we held that under the doctrine of strict products liability, "drug manufacturers have a duty to warn of dangers of which they know or should have known on the basis of reasonably obtainable or available knowledge." *Id.* at 434, 479 *A.*2d 374. At the retrial following our remand, plaintiff argued that Declomycin, an antibiotic manufactured by defendant, Lederle Laboratories (Lederle), had permanently turned her teeth gray, and that the drug had been defective during the years 1960 to 1963 (the time she had used it) because it had lacked a warning that its ingestion by young children might result in tooth staining. Defendant attempted to show that relevant federal statutes and regulations had precluded it from performing its state-law duty to warn, and asserted that it could not be held liable for doing that which the federal law had compelled. The trial court rejected that argument and submitted to the jury plaintiff's strict-liability claim based on failure to warn. On the basis of its finding that Declomycin had not been defective in either 1960 or 1961 but that it had been defective in 1962 and 1963, the jury found in favor of plaintiff and awarded her $300,000.

The Appellate Division, concluding that "the theory of liability which undergirded the jury verdict against Lederle was preempted by federal law," 234 *N.J.Super.* 559, 564, 561 *A.*2d 288 (1989), reversed and remanded the case for entry of judgment in favor of defendant. We granted plaintiff's petition for certification, 122 *N.J.* 348, 585 *A.*2d 360 (1990), to determine whether her strict-liability cause of action based on failure to warn is preempted under the supremacy clause, *U.S. Const.* art. VI, cl. 2. We hold that in the circumstances of this case federal law does not preempt liability under state law. Consequently, we reverse the judgment of the Appellate Division and remand to that court for consideration of the other issues previously raised on appeal there but not decided. See 234 *N.J.Super.* at 564–65 n. 3, 561 *A.*2d 288.

I

—A—

Tetracyclines, a group of antibiotics first introduced in 1948, are used to combat bacterial infections. A primary benefit of tetracyclines is that they are effective against a wider variety of organisms than are other antibiotics. In 1959 Lederle introduced a new tetracycline analogue, demethylchlortetracycline, under the trade name Declomycin. The 1959 edition of the *Physicians' Desk Reference* (*PDR*), an annual used by doctors to determine the appropriate administration and effects of prescription drugs, stated that Declomycin had "greater antibiotic potency that made it possible to achieve therapeutic activity with less weight of antibiotic," that it had "a reduced renal clearance rate that produced a prolongation of the antibacterial levels in the body," and that it was "therapeutically equally effective as other tetracyclines in infections caused by organisms sensitive to the tetracyclines." *Feldman* I, *supra*, 97 *N.J.* at 436, 479 *A.*2d 374. The description did not mention tooth discoloration as a possible side effect. *Ibid.* Beginning some time after 1963, the *PDR* contained a warning that administra-

tion of Declomycin during the developmental stage of the permanent teeth—prenatal to approximately seven years of age—could cause permanent tooth discoloration. *Ibid.*

Plaintiff, Carol Ann Feldman, was born in 1960. Her father, Dr. Harold Feldman, testified that he had treated plaintiff with Declomycin two or three times a year between 1960 and 1963. He had not maintained records of the administrations but said that he had given the antibiotic only nine or ten times during that period. ("Times" refers not to individual administrations but to courses of treatment lasting an indeterminate but brief period.)

Shortly after Declomycin was introduced, Dr. Feldman became acquainted with it through a medical representative employed by Lederle. Dr. Feldman stated that the representative "informed me as to its qualities, to its effectiveness, to how it was being suggested in its use," and that the representative had left samples with the doctor after telling him "how useful the drug was in treating upper respiratory infections and how that was palatable for children." The drug had been made available in cherry-flavored pediatric drops and syrup and custard-flavored oral suspension, and in varying forms of packaging, including clown-shaped bottles obviously intended for pediatric use. That no warning of the potential side effect of tooth discoloration accompanied the various forms of packaging of Declomycin prior to December 1963 is not disputed.

Plaintiff's baby teeth were discolored gray-brown. When plaintiff's permanent teeth began to erupt around 1965, Dr. Feldman became concerned because they too were discolored. After the family dentist examined plaintiff, he informed Dr. Feldman of "the possibility of a correlation between tetracycline and infant tooth staining." On learning from other physicians that some of them also were experiencing staining of teeth in patients treated with tetracyclines, Dr. Feldman stopped prescribing Declomycin for pediatric use.

No one disputes that the discoloration of plaintiff's teeth is the result of ingestion of tetracycline during the developmental stage of her permanent teeth, nor does defendant contest the jury's finding that Declomycin was the specific tetracycline involved. Rather, the dispute focuses on what action Lederle could and should have taken on acquiring knowledge of the correlation between the use of tetracyclines, particularly Declomycin, and staining of teeth.

Plaintiff contends that Lederle knew or through the exercise of reasonable diligence should have known of the possible serious and permanent side effects of Declomycin before and at the time she ingested the drug. She also asserts that Lederle "failed and refused to warn the plaintiff, pediatric consumers, and their physicians of those harmful effects in timely, adequate, and reasonable fashion." As evidence of Lederle's actual or constructive knowledge, plaintiff introduced at trial an internal Lederle report dated August 28, 1962. The third page of the report, under the heading *"Declomycin–Achromycin,"* reads:

> We are beginning to hear comments about the yellowing discoloration of teeth in children following tetracycline therapy. One physician, already reported to [Lederle's corporate headquarters], also states his own children's second teeth are soft following tetracycline therapy. This physician states he will discontinue using tetracyclines until this phenomenon is proven or disproven.

Within three months of that report, Dr. Swanzey, an employee of Lederle from 1955 through the 1970s, wrote a letter to the Food and Drug Administration (FDA) notifying it of the possibility of a correlation between tooth discoloration and tetracycline use. In the letter, dated November 16, 1962, Lederle proposed adding the following warning to the labeling of all its tetracycline products: "Use of any tetracycline during tooth development in the neonatal period or early childhood may cause discoloration of the teeth." The letter continued: "Your early opinion and consideration is requested in order that this statement may be added at the earliest possible time."

Dr. Raymond Barzilai, a medical officer with the FDA, responded to Dr. Swanzey's proposal by letter dated December 3,

1962. He indicated that the FDA had "not yet reached any form of final opinion (= medical, scientific, regulatory, etc.)," and was "currently devoting a great deal of active attention to the matter." Dr. Barzilai concluded: "[The FDA] will notify you as soon as any conclusion is reached." One copy of that letter bears a handwritten note suggesting that on its receipt, Lederle requested permission to disseminate the proposed warning in a circular but was "advised" by the FDA not to do so.

On January 15, 1963, Dr. Swanzey wrote to Dr. Barzilai with additional information relating to the possible correlation of tetracycline use and tooth discoloration. He related that he had spoken with a Dr. Zegarelli, who

confirmed that this phenomenon was peculiar to oxytetracycline, tetracycline, and chlortetracycline. He had no experience with demethylchlortetracycline. He felt that some statement is certainly indicated to be included in our package literature but expressed real concern that improper attention or publicity to this phenomenon should be avoided at all costs.

We [Lederle] are conducting some further discussions with others who may have had experience with the use of tetracyclines during the various periods of tooth developments, and based upon this we will arrive at a statement concerning which I will discuss with you later.

By letter dated February 4, 1963, the FDA informed Lederle of the following:

1. After an extensive analytical review of the subject, this Administration has concluded that the effects on bone and teeth caused by the systemic use of the Tetracycline(s) products are clinically substantial and should be properly brought to the attention of the medical profession.

2. At present, the alleged teratogenic effects from tetracycline(s) have not been sufficiently documented as to justify any form of action within our authorized functions.

The following warning statement is being proposed for insertion in the printed matter of all your Tetracycline products:

"Tetracyclines may form a stable calcium complex in any bone forming tissue with no serious harmful effects reported thus far in humans. However, use of any tetracycline drug during tooth development (= last trimester of pregnancy, neonatal period and early childhood) may cause discoloration of the teeth (= yellow-grey-brownish). This effect occurs mostly during long-term use of the drug but it has also been observed in usual short treatment courses".

\* \* \* \* \* \* \* \*

In closing, I wish to mention that this Administration appreciated your initiative of offering constructive suggestions as well as your cooperative spirit.

On February 14, 1963, Dr. Swanzey agreed to incorporate the FDA's "suggested statement" in Lederle's literature and stated: "I assume that this statement is being proposed for chlortetracycline, oxytetracycline and demethylchlortetracycline as well." He continued:

Before incorporating this in our labeling, however, I would like confirmation from you that it is acceptable to other manufacturers or if appropriate changes are to be made, thereby assuring that these effects *common to all of the tetracycline antibiotics* will be identical for all products. [Emphasis added.]

A letter of Dr. Barzilai dated February 18, 1963, furnished the requested confirmation:

1. This statement will have to appear only on the labeling for: Tetracycline, Chlortetracycline and Oxytetracycline. There is practically no specific clinical evidence to substantiate such a labeling requirement for Demethylchlortetracycline at present, but we intend to remain alert for such a future possibility.

\* \* \* \* \* \* \* \*

3. At any rate, I see no reasonable ground for any change in the wording of the statement and we [the FDA] expect to see it reproduced as is in the appropriate labelings as soon as possible.

In fact, the text of the warning was changed slightly, as Lederle learned from an FDA letter dated April 12, 1963. That letter went on to state: "We [the FDA] now have information that leads us to believe that this change in labeling should be made immediately. Therefore, we are asking that no further shipments be made of these drugs until the change has been made." Notably, although the letter displays a sense of urgency with respect to the warning, it, as well as other correspondence submitted by defendant, casts the FDA in a passive role. No change in the exception for Declomycin is indicated. That status was confirmed by a FDA press release issued April 18, 1963, which read in part: " 'There is no evidence to date that a fourth drug, demethylchlortetracycline, causes the discoloration,' FDA said." In fact there was such evidence at that time, as indicated by subsequent correspondence, although that evidence may not then have been available to the FDA.

In response to the exchange with the FDA, Lederle issued a memorandum to all its salespeople ·on April 23, 1963. With respect to Declomycin, the memorandum stated:

You will note that DECLOMYCIN is not included in the list of tetracycline analogues involved in this current revision. Therefore, the inserts and stickers are not to be attached to DECLOMYCIN circulars and literature. *While DECLOMYCIN has not been officially implicated with tooth staining, it probably will be within a short period of time,* therefore, any gain by making an issue of this fact would rebound unfavorably at a later date. In the meantime, in answer to any questions from a doctor concerning DECLOMYCIN and tooth staining, your answer is, "DECLOMYCIN has not as yet been officially implicated with tooth staining." [Emphasis added.]

Significantly, that response by Lederle does not indicate any intention to prevent or curtail use of Declomycin by the at-risk group; nor does there appear to have been any consideration given to suspending production of Declomycin in the form of flavored pediatric drops, syrup, or oral suspension pending the probable implication of Declomycin with tooth staining. The answer to be given inquiring physicians can be described accurately as evasive.

Lederle continued to correspond with the FDA regarding the possibility of a correlation between Declomycin and tooth staining. That correspondence, however, did not attempt to convince the FDA that a warning for Declomycin was necessary. Rather, on May 8, 1963, Dr. Swanzey submitted additional information to the FDA with a letter stating: "This is our total experience to date and is certainly still insufficient to establish clearly that demethylchlortetracycline may cause tooth staining. It is probably premature to conclude that a warning in labeling is indicated."

· Enclosed with that letter were publications and reports from practitioners strongly suggesting a correlation between Declomycin—as distinguished from tetracycline drugs in general—and tooth staining. The majority of those reports were in the possession of Lederle or its affiliates in 1962, with the most recent report being submitted to Cyanamid of Canada Limited (an affiliate of Lederle) in January 1963. The responsive letter from Cyanamid, dated February 1, 1963, stated in part: "At the

present time and with the information available, it can only be postulated that the discolouration has indeed been the result of Declomycin administration, and one must admit that there appears to be a likely association."

On May 31, 1963, FDA Commissioner George Larrick wrote to Dr. Swanzey regarding the warning and labeling change for tetracycline drugs. With respect to Declomycin he stated: "Actually, the original statement was revised to require the inclusion of the name of the drug in lieu of the word 'tetracyclines' because to date we have no evidence that your drug demethylchlortetracycline will stain teeth. If the warning statement as originally proposed is used, it automatically incriminates demethylchlortetracycline."

On July 1, 1963, Dr. Barzilai, responding to Lederle's letter of May 8th, stated:

> We have reviewed your information and we believe that it cannot as yet justify any change in our current formal position on this matter.
>
> You will realize, of course, that we need unequivocal factual evidence of adverse reaction in man to substantiate any official regulatory decision or action. Dr. Annett's case is only "suggestive" but, since grossly similar brown dental staining has long been observed in conditions other than Tetracycline treatment (cystic fibrosis is an example), this case would require further analysis by proper means (chemical, fluorescence, etc.) to eventually detect and identify the Tetracycline analogue.
>
> Your information will be filed in our records for future reference and be assured that we are following the development of this matter with utmost interest.

The record is silent on whether at any time Lederle undertook "further analysis by proper means" to confirm the suggested adverse reaction.

On November 11, 1963, Lederle's J. Kevin Rooney wrote to Dr. Barzilai that the manufacturer would incorporate a tooth-staining warning statement in all of its labeling for demethyl-chlortetracycline products. That letter was apparently a confirmation of a prior conversation authorizing the labeling change. The record does not reveal what additional information, if any, was brought to the FDA's attention in order to justify the change in its "current formal position." Lederle submitted the

revised labeling in December 1963 and incorporated it into the packaging of Declomycin shortly thereafter. The record contains no correspondence from the FDA reflecting its authorization of a change in labeling or its approval of the revised labeling submitted.

In 1975, Dr. Feldman wrote Lederle regarding the discoloration side effect. Lloyd S. Carr, then Lederle's Product Service Manager, replied in a letter stating that after "the causal relationship between tooth staining and tetracycline [had been] unquestionably demonstrated," Lederle had notified the FDA in November 1962 requesting permission to place a warning regarding discoloration on the labeling. Carr's letter went on to indicate that in April 1963 the FDA had "directed all manufacturers of tetracycline to include appropriate warnings in their labeling" but that Declomycin had been specifically excluded.

—B—

Plaintiff, through her father as *guardian ad litem,* filed suit in 1978 against Lederle and its parent corporation, American Cyanamid Company, seeking recovery under theories of negligence, gross negligence, breach of express and implied warranties, and strict products liability, among others. She alleged that Declomycin had been defective as marketed during the period when she had ingested the drug. A jury returned a verdict for defendant in 1980, and the Appellate Division affirmed in an unreported opinion. This Court granted plaintiff's petition for certification and summarily remanded the cause to the Appellate Division, 91 *N.J.* 266, 450 *A.*2d 579 (1982), for reconsideration in light of *Beshada v. Johns–Manville Products Corp.,* 90 *N.J.* 191, 447 *A.*2d 539 (1982). The Appellate Division again affirmed, 189 *N.J.Super.* 424, 460 *A.*2d 203 (1983), holding that *Beshada* did not apply and that prescription drugs are so important to society that suppliers should not be subject to strict liability. This Court granted a second petition for certification, 94 *N.J.* 594, 468 *A.*2d 230 (1983), and reversed and remanded for a new trial, holding that prescription drug

manufacturers are not immune from strict-liability claims. *Feldman* I, *supra,* 97 *N.J.* 429, 479 *A.*2d 374.

At the second trial in 1985 Lederle moved at the close of the evidence to dismiss the complaint on the basis of preemption. More specifically, it claimed that federal regulations in effect at the time of marketing and plaintiff's injury did not permit it to warn about the possibility of tooth staining without prior approval of the FDA. According to Lederle, compliance with the obligation under New Jersey law to communicate a warning based on subsequently-acquired actual or constructive knowledge of a danger "as soon as reasonably feasible," *Feldman* I, *supra,* 97 *N.J.* at 456, 479 *A.*2d 374, would have placed it in violation of federal regulations if the warning had been given without prior FDA approval. Lederle contended, therefore, that plaintiff's claim is preempted.

The court denied the motion, holding that the regulations at issue were not mandatory but discretionary, and

[did] not in any way bar a drug manufacturer from, in accordance with the language of *Feldman* [I], putting out adequate warnings when information indicating that the product may be dangerous to the public comes to that drug manufacturer's attention.

\* \* \* \* \* \* \* \*

I am not satisfied that the defendant has in this record presented to the Court anything that would change the Opinion of the New Jersey Supreme Court in [*Feldman* I] to the effect that this area has been pre-empted by the Federal Government.

The court noted specially that Lederle had cited no administrative decisions or case law construing the regulation to be mandatory. Moreover, the court observed that Dr. Goddard, the commissioner of the FDA from 1966 to 1968, had testified at a hearing pursuant to *Evidence Rule* 8 that the FDA had not been enforcing labeling regulations prior to his tenure as commissioner.

The jury returned a verdict for plaintiff on the sole count— alleging strict liability for failure to warn—of her amended complaint that the court had submitted. The verdict form reflected the following specific findings:

1. Plaintiff ingested Declomycin between 1960 and 1963.
2. There was not a defect in Declomycin because it failed to warn of tooth discoloration in 1960 and in 1961.
3. There was a defect in Declomycin because it failed to warn of tooth discoloration in 1962 and in 1963.
4. The failure to warn was a proximate cause of plaintiff's losses and injuries.

Lederle renewed its motion for judgment pursuant to *Rule* 4:40–2(b), and the trial court again denied the motion.

On appeal, Lederle continued to assert that plaintiff's claim based on failure to warn is preempted by federal laws and regulations governing labeling of antibiotics and prescription drugs. The Appellate Division reversed and remanded for entry of judgment in favor of Lederle:

> We conclude that the Food and Drug Administration's (FDA) regulation of the drug industry does not warrant a finding of implied federal preemption of all State tort claims grounded in strict liability failure to warn. However, under certain circumstances, such as presented here, federal law may preempt a discrete issue upon which liability is predicated because compliance with State decisional law would require federal law to be violated. Thus, plaintiff's entire cause of action was not preempted. However, the theory of liability not preempted was decided adversely to plaintiff by the jury and is not challenged on appeal, while the theory of liability which undergirded the jury verdict against Lederle was preempted by federal law. Thus, Lederle's motion for judgment notwithstanding the verdict should have been granted. [234 *N.J.Super.* at 564, 561 *A.*2d 288.]

From that ruling plaintiff petitioned for certification, which we granted. 122 *N.J.* 348, 585 *A.*2d 360 (1990). Plaintiff presents two distinct issues. First, she contends that the Appellate Division was bound by what she claims this Court decided in *Feldman* I, namely, that plaintiff's strict-liability claim based on failure to warn is not preempted by federal law. Second, plaintiff argues that even if the Appellate Division was free to consider the issue of preemption, its conclusion that plaintiff's claim is preempted by federal law was erroneous.

## II

The first issue is whether the Appellate Division was free to address the issue of preemption at all. Plaintiff contends that in *Feldman* I this Court determined that a cause of action

based on failure to warn was not preempted by FDA regulations governing the labeling of prescription drugs. According to plaintiff, the Appellate Division was consequently precluded by the law-of-the-case doctrine from reconsidering the issue after remand.

■ The law-of-the-case doctrine is a guide for judicial economy based on the sound policy that "when an issue is once litigated and decided during the course of a * * * case, that decision should be the end of the matter." *State v. Hale,* 127 *N.J.Super.* 407, 410, 317 *A.*2d 731 (App.Div.1974) (citing *United States v. United States Smelting, Ref. & Mining Co.,* 339 *U.S.* 186, 198, 70 *S.Ct.* 537, 544, 94 *L.Ed.* 750, 760–61 (1950)). Plaintiff's argument, however, is more accurately considered as one of precedent and supremacy. If this Court had conclusively resolved the preemption issue in *Feldman* I, that determination would not have been open to re-examination by the lower courts on remand. *See Liptak v. Frank,* 206 *N.J.Super.* 336, 338–39, 502 *A.*2d 1147 (App.Div.1985), *certif. denied,* 103 *N.J.* 471, 511 *A.*2d 652 (1986); *In re Educ. Ass'n,* 117 *N.J.Super.* 255, 261, 284 *A.*2d 374 *certif. denied,* 60 *N.J.* 198, 287 *A.*2d 458 (1972). However, the precedential effect of an opinion depends on the court's intention to resolve an issue squarely presented. *See, e.g., Lehigh Valley R.R. v. Chapman,* 35 *N.J.* 177, 187, 171 *A.*2d 653, *cert. denied,* 368 *U.S.* 928, 82 *S.Ct.* 364, 7 *L.Ed.*2d 192 (1961). Our analysis, therefore, necessarily turns to a determination of what we did—and did not—intend to resolve in *Feldman* I.

■ In *Feldman* I this Court noted that on the summary remand to the Appellate Division, defendant had raised for the first time the claim that federal regulations prohibited it from fulfilling its duty to warn because they precluded it from modifying its labeling without prior FDA approval. 97 *N.J.* at 458, 479 *A.*2d 374. The issue of federal preemption had been neither raised nor addressed at the first trial. *Ibid.* Consequently, Lederle had not presented evidence that FDA regula-

tions had prevented it from warning as soon as it became aware of the necessity. *Id.* at 446–47, 479 *A.*2d 374. We stated: "Under these circumstances we would ordinarily defer discus-sion of the issue. However, since the trial court may be faced with the problem on the retrial, * * * *some comments are in order.*" *Id.* at 458, 479 *A.*2d 374 (emphasis added).

In contrast, we stated in a footnote to the antecedent paragraph, addressing the proper jury charge on the obligation to warn to be used at the retrial, that

> plaintiff did not object to the charge and did not raise this issue on her initial appeal. Since the cause must be retried, * * * and the issue was raised and argued before us, *we have decided the question.* [*Id.* at 458 n. 7, 479 *A.*2d 374 (emphasis added).]

The quoted and emphasized language establishes that this Court was not at a loss for precise expression when declaring the weight that should be accorded its pronouncements. The language of *Feldman* I taken in its entirety clearly indicates that it was not intended to resolve the preemption issue and therefore did not preclude defendant from making its preemption argument, with additional proofs, on remand. See *United States Smelting, Ref. & Mining Co., supra,* 339 *U.S.* at 198, 70 *S.Ct.* at 544, 94 *L.Ed.* at 760–61.

### III

The more substantial issue is whether the Appellate Division correctly decided that plaintiff's cause of action based on failure to warn is preempted because of actual conflict with the obligations imposed by federal laws and regulations in effect at the time of distribution and ingestion. We conclude that plaintiff's cause of action is not preempted, there being no direct conflict with federal law.

### —A—

The preemption doctrine, rooted in the second clause of article VI of the United States Constitution, requires that when the mandates of federal law and state law are not consistent, the state law must yield. *See Wisconsin Pub.*

*Intervenor v. Mortier,* —— *U.S.* ——, ——, 111 *S.Ct.* 2476, 2481, 115 *L.Ed.*2d 534 (1991). Federal regulations have the same preemptive effect as federal statutes. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 *U.S.* 707, 713, 105 *S.Ct.* 2371, 2375, 85 *L.Ed.*2d 714, 721 (1985); *Capital Cities Cable, Inc., v. Crisp,* 467 *U.S.* 691, 699, 104 *S.Ct.* 2694, 2700, 81 *L.Ed.*2d 580, 589 (1984). Furthermore, the doctrine applies equally to state common law and state statutory law. *Chicago N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 *U.S.* 311, 325–26, 101 *S.Ct.* 1124, 1134, 67 *L.Ed.*2d 258, 270 (1981).

■ Preemption may occur in several ways. Provided Congress or the federal agency is acting within the scope of its authority, express language may exclude state law. *Schneidewind v. ANR Pipeline Co.,* 485 *U.S.* 293, 299, 108 *S.Ct.* 1145, 1150, 99 *L.Ed.*2d 316, 325 (1988). In the absence of a clear expression, the "intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County, supra,* 471 *U.S.* at 713, 105 *S.Ct.* at 2375, 85 *L.Ed.*2d at 721 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447, 1459 (1947)). Where "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose," the intent to preempt state law will be inferred. *Rice, supra,* 331 *U.S.* at 230, 67 *S.Ct.* at 1152, 91 *L.Ed.* at 1459. A third situation in which preemption will be implied occurs when " 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 *U.S.* 141, 153, 102 *S.Ct.* 3014, 3022, 73 *L.Ed.*2d 664, 675 (1982) (quoting *Rice, supra,* 331 *U.S.* at 230, 67 *S.Ct.* at 1152, 91 *L.Ed.* at 1459).

■ Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 *U.S.* 132, 142–43, 83 *S.Ct.* 1210, 1217, 10 *L.Ed.*2d 248, 257 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581, 587 (1941). Once the impossibility of dual compliance is established, the importance to the State of its own law is immaterial. *Felder v. Casey*, 487 *U.S.* 131, 138, 108 *S.Ct.* 2302, 2306, 101 *L.Ed.*2d 123, 138 (1988); *Brown v. Hotel Employees & Bartenders Int'l Union Local 54*, 468 *U.S.* 491, 503, 104 *S.Ct.* 3179, 3186, 82 *L.Ed.*2d 373, 384 (1984). When there is a conflict, "the federal law must prevail." *Free v. Bland*, 369 *U.S.* 663, 666, 82 *S.Ct.* 1089, 1092, 8 *L.Ed.*2d 180, 183 (1962); *see also de la Cuesta, supra*, 458 *U.S.* at 153, 102 *S.Ct.* at 3022, 73 *L.Ed.*2d at 675 ("state law is nullified to the extent that it actually conflicts with federal law"). The conflict, however, must be actual, not merely potential, speculative, or hypothetical. *Rice v. Norman Williams Co.*, 458 *U.S.* 654, 659, 102 *S.Ct.* 3294, 3299, 73 *L.Ed.*2d 1042, 1049 (1982).

In *de la Cuesta*, the Supreme Court addressed an alleged conflict between regulations issued by the Federal Home Loan Bank Board (Board) that authorized due-on-sale clauses (clauses that grant a lender the option to demand immediate payment of the loan balance if the subject property is sold or transferred without the lender's consent) in the loan contracts of federal savings and loan associations, and provisions of the California Civil Code that had been interpreted by the state to limit enforceability of such clauses. The Court found both a clear and manifest expression of an intent to preempt and an actual conflict:

[California law] explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate towards current market rates—a due-on-sale practice the Board has approved and views as critical to "financial stability of the association." [458 *U.S.* at 156, 102 *S.Ct.* at 3024, 73 *L.Ed.*2d at 677.]

Because the Court also found that the Board was acting within its authority, the conflicting state regulations limiting due-on-sale practices of federal associations were preempted.

In contrast, in *Silkwood v. Kerr–McGee Corp.*, 464 *U.S.* 238, 104 *S.Ct.* 615, 78 *L.Ed.*2d 443 (1984), the Court found that the Atomic Energy Act and its enacting regulations did not preclude an award of punitive damages under state law. The Court recognized that states had been expressly prohibited from regulating the safety aspects of hazardous materials, but refused to extend that prohibition to state-law remedies for persons injured from radiation exposure in nuclear plants. *Id.* at 250–51, 104 *S.Ct.* at 622–23, 78 *L.Ed.*2d at 453–54. The Court rejected the contention that the award of damages would conflict with the federal remedial scheme, finding that "[p]aying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible." *Id.* at 257, 104 *S.Ct.* at 626, 78 *L.Ed.*2d at 458. It concluded that

> the provision cited by Kerr–McGee goes on to state that atomic energy should be developed and utilized only to the extent it is consistent "with the health and safety of the public." 42 *U.S.C.* § 2013(d). Congress therefore disclaimed any interest in promoting the development and utilization of atomic energy by means that fail to provide adequate remedies for those who are injured by exposure to hazardous nuclear materials. [*Ibid.*]

The Supreme Court has since unanimously confirmed that " '[o]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.' " *English v. General Elec. Co.*, —— *U.S.* ——, ——, 110 *S.Ct.* 2270, 2280, 110 *L.Ed.*2d 65, 81 (1990) (quoting *California v. ARC Am. Corp.*, 490 *U.S.* 93, 105, 109 *S.Ct.* 1661, 1667, 104 *L.Ed.*2d 86, 97 (1989) (seven justices participating)). Furthermore, as stated in *English*, "[t]he 'teaching of this Court's decisions * * * enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' " *Id.* at ——, 110 *S.Ct.* at 2281, 110 *L.Ed.*2d at 81 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 *U.S.* 440, 446, 80 *S.Ct.* 813, 817, 4 *L.Ed.*2d 852, 858 (1960)).

■■■ Although "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield," *Free, supra,* 369 *U.S.* at 666, 82 *S.Ct.* at 1092, 8 *L.Ed.*2d at 183, the initiation point of the preemption analysis depends on the area of law involved. Because plaintiff's claims concern rights and remedies traditionally defined solely by state law, namely, tort compensation, defendant here must overcome a presumption against preemption:

> When Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." [*California v. ARC Am. Corp., supra,* 490 *U.S.* at 101, 109 *S.Ct.* at 1665, 104 *L.Ed.*2d at 94 (quoting *Rice v. Santa Fe Elevator Corp., supra,* 331 *U.S.* at 230, 67 *S.Ct.* at 1152, 91 *L.Ed.* at 1459); *accord Mortier, supra,* —— *U.S.* at ——, 111 *S.Ct.* at 2481, (adopting initial assumption stated in *Rice* "[w]hen considering pre-emption"); *see also Hillsborough County, supra,* 471 *U.S.* at 715, 105 *S.Ct.* at 2376, 85 *L.Ed.*2d at 722 (recognizing a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause").]

In *Silkwood,* the Court emphasized the absence of evidence that Congress had intended to preempt state-law claims or that it had even considered the issue. That absence of a clear and manifest purpose to preempt took on "added significance in light of Congress' failure to provide any federal remedy for persons injured by such [illegal] conduct." 464 *U.S.* at 251, 104 *S.Ct.* at 623, 78 *L.Ed.*2d at 454.

We recently considered preemption of a claim "traditionally defined solely by state law"—a strict-liability claim based on failure to warn—in *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 577 *A.*2d 1239 (1990). In *Dewey* this Court rejected the argument that preemption was necessary because the incidental regulatory pressure exerted by a jury verdict would conflict with the Cigarette Act's secondary goal of uniform regulation. *Id.* at 88–94, 577 *A.*2d 1239. Quoting *Silkwood,* we determined that such incidental regulatory effect does not necessarily create a conflict sufficient to require preemption, even where direct state regulation is preempted expressly:

"It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." [*Id.* at 89, 577 *A.*2d 1239 (quoting *Silkwood, supra,* 464 *U.S.* at 256, 104 *S.Ct.* at 625, 78 *L.Ed.*2d at 457).]

Turning to an analysis of the actual regulatory effect that the imposition of state-law liability would have, this Court identified three options for the cigarette manufacturer: (1) "voluntarily" adding an additional warning, (2) adding an insert, and (3) "choosing to do nothing and risking exposure to liability." *Id.* at 90, 577 *A.*2d 1239. Hence, the manufacturer would not be compelled to act in contradiction of the federal labeling requirement that expressly prohibits mandatory state labeling regulations. Furthermore, we stated that even if the manufacturer could not alter its label, a jury could conclude that the manufacturer nevertheless should bear the loss that could have been prevented with a more detailed warning label. *Id.* at 91–92, 577 *A.*2d 1239; *see also Ferebee v. Chevron Chem. Co.,* 736 *F.*2d 1529, 1541 (D.C.Cir.) ("Even if Chevron could not alter the label, Maryland could decide that, as between a manufacturer and an injured party, the manufacturer ought to bear the cost of compensating for injuries that could have been prevented with a more detailed label than that approved by the EPA."), *cert. denied,* 469 *U.S.* 1062, 105 *S.Ct.* 545, 83 *L.Ed.*2d 432 (1984). *But see Papas v. Upjohn Co.,* 926 *F.*2d 1019 (11th Cir.1991) (available on Westlaw, CTA11 database, 1991 WL 25740) (holding state tort actions for inadequate warning preempted by Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and its enacting regulations). This Court noted in *Dewey* that FIFRA, the statute addressed in *Ferebee* and *Papas,* also contained a preemption clause presumably intended to promote uniformity of labeling, and agreed with the court in *Ferebee* that the existence of such a goal did not necessarily require a finding of preemption. 121 *N.J.* at 92, 577 *A.*2d 1239; *cf. Burch v. Amsterdam Corp.,* 366 *A.*2d 1079, 1085 (D.C.1976) (manufacturer of hazardous substance not immune from liabili-

ty based on inadequate warning even though Federal Hazardous Substance Act precludes a state requirement unless such requirement is identical to the warning established by the Act); *MacDonald v. Ortho Pharmaceutical Corp.*, 394 *Mass.* 131, 139–40, 475 *N.E.*2d 65, 70–71 (compliance with FDA–approved labels does not immunize manufacturers from liability despite implied goal of precise and nationally-uniform labeling), *cert. denied*, 474 *U.S.* 920, 106 *S.Ct.* 250, 88 *L.Ed.*2d 258 (1985).

Adopting here the reasoning of *Dewey*, we agree with the Appellate Division that plaintiff's claim is not preempted expressly or by implication. We diverge, however, from the Appellate Division's reasoning that that claim is barred because of a direct conflict between obligations imposed by federal law and those under state tort law. We did not reach that issue in *Dewey*. See 121 *N.J.* at 86, 577 *A.*2d 1239. We also recognize that preemption in the regulation of prescription drugs raises somewhat different concerns from those related to regulating cigarettes that we addressed in *Dewey*. We therefore consider the reasoning of other jurisdictions that have addressed preemption in the context of FDA and similar regulations and focus our analysis on conflict preemption, specifically that body of case law addressing impossibility of dual compliance.

The Appellate Division adopted the reasoning of *Hurley v. Lederle Laboratories Division of American Cyanamid*, 851 *F.*2d 1536, *modified*, 863 *F.*2d 1173 (5th Cir.1988), in concluding that plaintiff's warning claims were preempted due to conflict with obligations under federal law. See 234 *N.J.Super.* at 591–92, 561 *A.*2d 288. In *Hurley*, the plaintiff alleged the failure to warn adequately of the possible severe adverse reactions to a vaccine and the production and marketing of an unreasonably-dangerous product. The district court granted partial summary judgment in favor of Lederle, finding that the Federal Food, Drug and Cosmetic Act of 1938 (FDCA), the Public Health Service Act (PHSA), and the regulations enacting them preempted *any* state-law claims based on defective design of

the vaccine or on the inadequacy of its warning label. *Hurley, supra*, 851 *F.*2d at 1538.

Although the Fifth Circuit reversed and remanded, the court, in addressing conflict preemption, stated that the regulations at issue provide that the FDA determines a warning it deems appropriate and "[m]ost important[ly], the manufacturers cannot change the language * * * without FDA approval." *Id.* at 1542. The court then concluded that

> [i]t would be patently inconsistent for a state then to hold the manufacturer liable for including that precise warning when the manufacturer would otherwise be liable for *not* including it. Thus, assuming that the FDA has processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state. [*Ibid.*]

The court limited the inquiry on remand to whether Lederle had withheld information from the FDA; "[o]therwise, the FDA-approved warning is sufficient." *Id.* at 1543.

In *Abbot v. American Cyanamid Co.*, 844 *F.*2d 1108, *cert. denied*, 488 *U.S.* 908, 109 *S.Ct.* 260, 102 *L.Ed.*2d 248 (1988), the Fourth Circuit was faced with the same issue presented in *Hurley*, namely, preemption of defective-design and failure-to-warn claims by FDA regulations governing vaccines. That court reversed the district court's finding of preemption, rejecting as its bases the comprehensiveness of the federal scheme and frustration of purpose. *Id.* at 1112–14. The Fourth Circuit also rejected the district court's determination that the warning given by the defendant was adequate as a matter of law despite acknowledging that the labeling "once approved, cannot be changed without FDA approval." *Id.* at 1112, 1115 ("adequacy of a warning is a question of fact for the jury").

In *Mazur v. Merck & Co.*, 742 *F.Supp.* 239 (E.D.Pa.1990), the defendant asserted that the pervasive scheme regulating all aspects of vaccines compelled a finding of implied preemption. The court disagreed, despite finding that: (1) the regulation of vaccines is comprehensive; (2) the FDA had approved the package insert disseminated by the defendant and alleged to be inadequate; (3) the vaccine labeling must receive federal ap-

proval; and (4) the language of the labeling cannot be changed without authorization of the FDA. *Id.* at 244–46. Noting the strong presumption against preemption both of state tort remedies and in areas of health and safety, and recognizing that preemption would leave Pennsylvania citizens harmed by vaccines without a state tort remedy, that court agreed "with the great majority of courts addressing this issue that Congress did not impliedly preempt state regulation of vaccine manufacture, distribution, and labeling." *Id.* at 246 (footnote listing other cases in which no preemption was found omitted). *See generally* Annotation, *Federal Pre-emption of State Common–Law Products Liability Claims Pertaining to Drugs, Medical Devices, and Other Health–Related Items*, 98 *A.L.R.Fed.* 124 (1990) (collecting cases).

The court also rejected the defendant's narrower conflict-preemption argument based on two observations equally appropriate to the circumstances here:

[M]ere compliance with an FDA suggestion, or for that matter, regulation or order, does not mean that state tort law becomes irrelevant. First, compliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care, but compliance does not necessarily absolve the manufacturer of all liability. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.*, 642 *F.*2d 652, 658 (1st Cir.1981). Manufacturers must meet state safety requirements, whether codified or embodied in the common law, in addition to satisfying the initial FDA requirements.

Second, federal regulation serves a very different purpose [from] state tort law. Essentially, federal regulation serves a deterrent purpose by limiting the manufacture of inherently dangerous products to those applicants who meet certain stringent safety standards, while state tort law serves the equally important purpose of compensating individuals injured by those very same products. *[Because] compliance with FDA regulations will not ensure that a manufacturer's products will not cause injury, compliance will not necessarily exempt a manufacturer from liability. When those products do cause injuries, the state tort system provides a means of compensation.* State tort law is intended to supplement federal regulation by providing a vehicle for compensation of vaccine-related injuries. [*Id.* at 247 (footnote omitted) (emphasis added).]

In *Ferebee v. Chevron Chemical Co., supra*, 736 *F.*2d 1529, the issue was whether the extensive regulation of paraquat by the Environmental Protection Agency (EPA) and compliance

therewith by a manufacturer precluded an inadequate-warning claim under Maryland law. Chevron contended that because the EPA, after careful consideration, had approved the labeling of the paraquat used by the plaintiff, the jury was bound by the EPA's determination and therefore could not find the labeling inadequate. *Id.* at 1540.

The court disagreed, reasoning that state tort law may have distinct and "broader compensatory goals." *Ibid.*

[C]onceivably, a label may be inadequate under state law if that label, while sufficient under a cost-benefit standard, nonetheless fails to warn against any significant risk. In addition, even if the ultimate purposes of federal and state law in this area are the same, a state (acting through its jurors) may assign distinct weight to the elements which go into determining whether a substance as labelled is of sufficient net benefit as to warrant its use.

\* \* \* \* \* \* \* \*

[I]t need not be the case, as Chevron apparently assumes, that the company can be held liable for failure to warn only if the company could actually have altered its warning. \* \* \* Maryland could decide that, as between a manufacturer and an injured party, the manufacturer ought to bear the cost of compensating for those injuries that could have been prevented with a more detailed label than that approved by the EPA. \* \* \* Chevron can comply with both federal and state law by continuing to use the EPA-approved label and by simultaneously paying damages to successful tort plaintiffs such as Mr. Ferebee. [*Id.* at 1540–41.]

The Eleventh Circuit rejected the reasoning of *Ferebee* in *Papas v. Upjohn Co., supra*, 926 *F.*2d 1019, holding that "FIFRA impliedly preempts state common law tort suits against manufacturers of EPA-registered pesticides to the extent that such actions are based on claims of inadequate labeling." *Id.* at 1024–25 (footnote omitted). That court found preemption on several bases, including a direct conflict via a jury determination of inadequate warning with the EPA's determination that the labeling is adequate and with "the Congressional intent that *the EPA Administrator* determine the reasonableness of the risks to man and the environment posed by pesticides." *Id.* at 1025. It also noted that the federal district courts are split on the issue. See *id.* at 1021 n. 1 (collecting cases). The split among courts addressing the issue suggests that there is not a "clear and manifest" expression of congres-

sional intent and calls into question the reasoning and authority of *Papas.*

Those cases finding preemption based on direct conflict typically have involved patently-incompatible affirmative obligations under federal and state laws. An example is *Grocery Manufacturers of America, Inc. v. Gerace,* 755 *F.*2d 993 (2d Cir.), *aff'd,* 474 *U.S.* 801, 106 *S.Ct.* 36, 88 *L.Ed.*2d 29 (1985). In *Gerace* the plaintiff contended that New York regulations requiring use of "imitation" on labeling of cheese products directly conflicted with "imitation" as defined for use by federal regulations promulgated pursuant to the FDCA. Compliance with the state regulations would subject a manufacturer to liability for misbranding under federal regulations. The court agreed that compliance with both state and federal law was impossible and held the former to be preempted as applied to the specific area of "imitation" cheese. *Id.* at 1001.

In *Cosmetic, Toiletry & Fragrance Association v. Minnesota,* 440 *F.Supp.* 1216 (D.Minn.1977), *aff'd,* 575 *F.*2d 1256 (8th Cir.1978), the court was faced with federal and state labeling requirements for chlorofluorocarbons. The state statute and the FDA regulation required identical labels but differed on the location. *Id.* at 1219. Addressing the issue at the preliminary-injunction stage, the court found that the plaintiffs, who contended that the state regulations were invalid, had shown a substantial likelihood of success at trial on the preemption issue. *Id.* at 1225. It therefore issued the injunction. *Id.* at 1219.

We also note that in both *Gerace* and *Cosmetic, Toiletry & Fragrance Association* the purpose of the state enactment was regulatory rather than compensatory. Here, the obligations under federal and state law are neither patently incompatible nor inconsistent regulatory efforts to accomplish the same purpose. See *English v. General Elec. Co., supra,* —— *U.S.* at ——, 110 *S.Ct.* at 2280, 110 *L.Ed.*2d at 81; *Silkwood, supra,*

464 *U.S.* at 263–64, 104 *S.Ct.* at 629, 78 *L.Ed.*2d at 462 (Blackmun, J., dissenting).

—B—

Turning our attention to this case, we begin by identifying the relevant state and federal laws operating in the field being considered. See *Chamber of Commerce of the United States v. State,* 89 *N.J.* 131, 142, 445 *A.*2d 353 (1982). Under New Jersey law a manufacturer is strictly liable for damages resulting from use of its products when the manufacturer fails to produce and distribute a product that is fit, suitable, and safe for its foreseeable purposes. *See Feldman* I, *supra,* 97 *N.J.* at 450, 479 *A.*2d 374. A product may be unsafe, and therefore defective, because of a failure to warn or an inadequate warning. *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 242, 432 *A.*2d 925 (1981). A manufacturer is obligated to communicate a warning based on subsequently-acquired knowledge of a danger "as soon as reasonably feasible." *Feldman* I, *supra,* 97 *N.J.* at 456, 479 *A.*2d 374. "Generally speaking, the doctrine of strict liability assumes that enterprises should be responsible for damages to consumers resulting from defective products regardless of fault." *Id.* at 450, 479 *A.*2d 374. When liability is premised on the failure to warn or an inadequate warning, the issue becomes whether the manufacturer knew or could have known of the danger and, if so, whether it "acted in a reasonably prudent manner in marketing the product or in providing the warnings given." *Id.* at 451–52, 479 *A.*2d 374. Under that standard negligence and strict liability in failure-to-warn cases may be deemed to be functional equivalents. *Id.* at 452, 479 *A.*2d 374.

The manufacture, sale, and marketing of prescription drugs is extensively regulated by the FDA pursuant to the FDCA and its many amendments and enacting regulations. Specifically, section 331 of Title 21 of the United States Code prohibits the introduction into interstate commerce of any drug that is misbranded. A drug is deemed to be misbranded "[i]f

its labeling is false or misleading in any particular," 21 *U.S.C.A.* § 352(a), if its labeling does not bear "adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health," *id.* § 352(f), or if it is an antibiotic drug, "unless (1) it is from a batch with respect to which a certificate or release has been issued pursuant to section 357 of this title, and (2) such certificate or release is in effect with respect to such drug." *Id.* § 352(*l*). For new drugs the federal scheme has a separate provision that "[n]o person shall introduce * * * into interstate commerce any new drug[ ] unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug." *Id.* § 355(a). The approval process includes review of the proposed labeling. The FDA will deny or withdraw approval if the "labeling is false or misleading in any particular" or "contains any untrue statement of material fact," or if "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling." *Id.* § 355(d) and (e).

> As used in this subsection and subsection (e) of this section, the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. [*Id.* § 355(d).]

Those statutory provisions are augmented by regulations for enforcement of the FDCA and for certification of antibiotic drugs. Lederle claims that the versions of those regulations in effect at the relevant time did not permit it, without prior approval of the FDA, to warn about the possibility of tooth staining. The pertinent regulations state in part:

> A supplemental application should be submitted for any change beyond the variations provided for in the application * * * that may alter the conditions of use, the labeling, the safety, identity, strength, quality or purity of the drug * * *. Labeling changes include deviations from the authorized brochure in

any mailing or promotional piece used after the drug is placed on the market. When necessary for the safety of the drug, a supplemental application may be required to specify a period of time within which the proposed change will be made; and in such case the distribution of the drug after such time without such change constitutes distribution without an effective new-drug application. If a material change is made in the * * * labeling or advertising[ ] from the representations in an effective application for a new drug, and the drug is marketed before a supplement is effective for such change, the application may be suspended under § 130.27 on the grounds that it contains an untrue statement of a material fact. [21 *C.F.R.* § 130.9(a) (1960).]

Lederle also claims that warning without prior FDA approval would have violated regulations governing certification of batches of antibiotics, which stated:

(b) A certificate shall cease to be effective:

\* \* \* \* \* \* \* \*

(2) With respect to any immediate container * * * when its label or labeling is altered, mutilated, destroyed, obliterated, or removed in whole or in part, or ceases to conform to any labeling requirement prescribed by the regulations in this part, except that:

(i) If the drug in such container is repacked * * *, and certification of the batch thus made is requested, such certificate shall continue to be effective for a reasonable time * * *; [or]

\* \* \* \* \* \* \* \*

(iii) If its label or labeling is removed in whole or in part for the purpose of relabeling and supplemental certification of the relabeled drug is requested * * *. [21 *C.F.R.* § 146.4 (1955).]

According to Lederle, compliance with the obligation under New Jersey law to communicate a warning based on subsequently-acquired actual or constructive knowledge of a danger "as soon as reasonably feasible," *Feldman I, supra,* 97 *N.J.* at 456, 479 *A.*2d 374, would have placed it in violation of the federal statutes and regulations if the warning had been given without prior FDA approval. Relying heavily on subsequent amendments and statements regarding the labeling regulations and the FDA's interests with respect to drugs, the Appellate Division agreed, concluding that "the clear wording of [section 130.9(a) ] required Lederle to seek the approval of the FDA to change the package inserts dispensed with the drug." 234 *N.J.Super.* at 588, 561 *A.*2d 288. The court felt constrained to conclude, based on the jury's findings on when Declomycin was

defective, that the jury had found liability based on Lederle's failure to warn during the period it had corresponded with the FDA—November 1962 to December 1963. *Id.* at 573, 561 *A.*2d 288. The court then held that principles of conflict preemption precluded the assessment of liability for failure to warn without prior approval during that period.

Implicit in the Appellate Division's conclusion is the notion that compliance with the letter of section 130.9(a) precludes finding for plaintiff on her strict-liability claim for failure to warn. Reading that provision in the context of the FDCA, however, and recognizing, as found by the Appellate Division, that "Congress' overriding purpose in enacting the FDCA was to protect consumers from dangerous drugs and antibiotics," *id.* at 581, 561 *A.*2d 288, we are satisfied that federal law did not clearly require that Lederle obtain prior approval from the FDA before warning of a known or knowable danger. Accordingly, we find nothing in the federal scheme to support the assertion that manufacturers of prescription drugs and antibiotics who literally comply with that isolated provision must be immune from state tort liability for injuries caused by their products. In the absence of a clear and manifest purpose to preclude the traditional workings of the tort compensation system, we find no conflict and hence no preemption.

We conclude that there is not a sufficient basis on which to find a direct conflict between state and federal law. The correspondence between Lederle and the FDA in 1962 and 1963 does not foreclose a finding either that state damage actions could act as compensatory supplements to the existing regulatory framework or that the FDA had neither considered nor addressed the preemptive effect of the regulations at that time. In light of the Supreme Court's concern, expressed most recently in *English* and *ARC America Corp.*, that injured plaintiffs not be denied a remedy in the absence of a clearly-expressed intention, we adopt the reasoning of *Abbot, Mazur,* and *Ferebee* here. Applying their reasoning will advance the primary purposes of both federal and state law, respectively, protecting the

public health and compensating those injured when that protection fails, without compelling drug manufacturers to violate federal statutes or regulations.

—C—

The FDCA "as a whole was designed primarily to protect consumers from dangerous products." *United States v. Sullivan*, 332 *U.S.* 689, 696, 68 *S.Ct.* 331, 335, 92 *L.Ed.* 297, 303 (1948). We continue to believe, as we stated in *Feldman* I, that for the FDA to have prevented a drug manufacturer from warning the public of a newly-discovered danger pending development of unequivocal factual evidence of adverse reaction in man "would seem anomalous." 97 *N.J.* at 459, 479 *A.*2d 374. A direct conflict is not clear from the evidence presented—or attempted to be presented—at trial. Dr. Swanzey testified only to an industry understanding that the FDA regulations required prior approval. Dr. Goddard's report indicated that he believed the regulations required prior approval, but the relevant time period for this case was before his tenure as commissioner. Furthermore, his testimony at the *Evidence Rule* 8 hearing indicated that the labeling regulations had not been enforced before his arrival. The assertion that Lederle would have been subject to punishment for "misbranding" or would have had its product barred from the market if it had added an unapproved warning is based merely on Lederle's interpretation of the regulations then in effect. Lederle presents no evidence indicating that the FDA ever took such action for adding a warning suggesting a *limitation* on use rather than an unapproved representation of a benefit, nor does the record reflect any statement by the FDA to the effect that it would have taken action had a manufacturer attempted to warn without prior approval.

Lederle relies heavily on the modification of the new-drug labeling regulations in 1965 and subsequent statements of the FDA to support its argument that Congress and the FDA intended that modification of labeling without prior approval

had not been allowed previously, namely, at the time plaintiff had ingested the drug. The relevant FDCA-enforcement regulations were amended in 1965 to permit expressly "plac[ing] into effect at the earliest possible time" proposed additions to labeling "of additional warning, contraindication, side-effect, and precaution information." 30 *Fed.Reg.* 993 (1965) (codified at 21 *C.F.R.* § 130.9(d)). The amendment went on to add:

It will be the policy of the Food and Drug Administration to take no action against a drug or applicant solely because changes of the kinds described in paragraph (d) of this section are placed in effect by the applicant prior to [its] receipt of a written notice of approval of the supplemental new drug application. [*Ibid.* (codified at 21 *C.F.R.* § 130.9(e)).]

The additions to section 130.9 were made effective immediately on publication in the Federal Register because they were in the interest of "drug safety" and "the public health, [were] noncontroversial, and relax[ed] existing requirements." *Ibid.* The regulations controlling antibiotics were similarly modified in 1966 to permit dissemination of modified labeling without awaiting advance approval. *See* 31 *Fed.Reg.* 11,415 (1966).

Although we recognize that subsequent actions of an agency are relevant to determining prior intent, *see Grove City College v. Bell,* 465 *U.S.* 555, 567, 104 *S.Ct.* 1211, 1218, 79 *L.Ed.*2d 516, 528 (1984), we do not agree that the conclusion that Lederle asserts necessarily follows. It contends that the modification shows that independent action was not permitted under the former regulations. An equally-compelling conclusion, however, is that the FDA had not addressed itself to the issue before. *Cf.* 3A Frumer & Friedman, *Products Liability* § 50.-03[1], 50–255 n. 37 (1990) ("One could argue that the changes made in § 130.9 in 1965 * * * indicate that FDA approval of precautionary information was required prior thereto. One could also argue that the change in language was meant to clear up a misconception."). Arguably, then, on squarely considering the issue, the FDA determined that warning of possible dangerous side effects "at the earliest possible time," 30 *Fed.Reg.* 993 (1965), was consistent with its primary purpose to protect the public health.

There is additional support for that conclusion. The 1965 modifications did not materialize out of a vacuum. The changes were made to implement the Kefauver–Harris Drug Amendments enacted on October 10, 1962. See U.S. Food and Drug Administration, *Annual Reports 1950–1974* 374–75, 480–81, 527–28 (Dep't of Health, Education and Welfare 1976). The FDA understood those amendments to require that prescription-drug advertisements "contain a brief summary of information as to adverse side effects of the drug and warnings of when it should not be administered." *Id.* at 375. Dr. Goddard testified that the FDA regulations had not been enforced prior to his appointment as commissioner. That inaction could be explained rationally as recognition that the regulations in effect did not reflect the requirements of the FDCA as amended. The 1965 modifications to the regulations, then, demonstrate not an intent to require FDA pre-approval of warnings prior to 1965 but rather only an effort to clarify that in accordance with the purposes of the FDA, warnings of side effects were required. *See* 25 *Fed.Reg.* 12,595 (1960) (regulations governing labeling of new drugs were amended in 1960 for the express purpose of "requiring manufacturers to furnish adequate information for the professional use of prescription drugs and devices").

When the issue is viewed as which party should bear the loss occasioned by a product marketed without warning of its dangerous propensities, Lederle's contention based on the subsequent revision of the labeling regulations is even less persuasive. The 1965 modification and the pre-existing regulations are equally mute on the intention to deny compensation to persons injured by the use of antibiotic drugs. Lederle has not presented any evidence—such as legislative history or an administrative decision—displaying a congressional intent to preempt all or any methods of tort compensation. The majority in *Silkwood* found no inconsistency in letting persons injured by nuclear hazards recover under state tort law despite Congress' express intent to have the Nuclear Regulatory Commission exclusively regulate the safety of nuclear facilities. 464

*U.S.* at 257–58, 104 *S.Ct.* at 626, 78 *L.Ed.*2d at 458. Notably, the dissenting justices agreed concerning the award of compensatory damages. See *id.* at 263–64, 104 *S.Ct.* at 629, 78 *L.Ed.*2d at 462 (Blackmun, J., dissenting) ("Because the Federal Government does not regulate the compensation of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all, the pre-emption analysis established by [*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 *U.S.* 190, 103 *S.Ct.* 1713, 75 *L.Ed.*2d 752 (1983),] comfortably accommodates—indeed it compels—the conclusion that compensatory damages are not preempted whereas punitive damages are" (footnote omitted).); *id.* 464 *U.S.* at 275, 104 *S.Ct.* at 635, 78 *L.Ed.*2d at 469 (Powell, J., dissenting) ("Where injury is sustained as a result of the operation of a nuclear facility, it is not contested that *compensatory* damages under state law properly may be awarded."). We reach a similar conclusion here.

Finally, we note that a finding of preemption would leave plaintiff remediless, a fact that, based on *Silkwood* and *Dewey*, strengthens the presumption against preemption. See *Silkwood, supra,* 464 *U.S.* at 251, 104 *S.Ct.* at 623, 78 *L.Ed.*2d at 454; *Dewey, supra,* 121 *N.J.* at 84–85, 577 *A.*2d 1239. However the action is viewed, the revision does not display a "clear and manifest" intent to preclude either (1) warning without prior FDA approval or (2) determining under state law that the manufacturer should bear the loss caused by a defective product, namely, a product marketed without a warning of a known or knowable dangerous side effect.

The Appellate Division, interpreting two cases from other jurisdictions addressing the regulations in effect at the time of plaintiff's ingestion of Declomycin, found that both cases concluded that FDA approval was required prior to making a labeling change. 234 *N.J.Super.* at 588, 561 *A.*2d 288. One case, *Roginsky v. Richardson–Merrell, Inc.,* 378 *F.*2d 832 (2d Cir.1967), assumed that advance permission from the FDA was required apparently because neither party had raised the issue.

*Id.* at 835, 848. That court did not render a specific finding, nor did it indicate any authority compelling its conclusion. The other case merely cited *Roginsky.* See *Miller v. Upjohn Co.,* 465 *So.*2d 42 (Ct.App.), *writ denied,* 467 *So.*2d 533 (La.1985). To the extent those cases addressed preemption of failure-to-warn claims, the analyses are uncompelling, and we decline to follow them.

The Appellate Division also strongly emphasized the FDA's interest in "rational prescribing." See 234 *N.J.Super.* at 593–95, 561 *A.*2d 288. However, the Commissioner of the FDA has stated that "[i]t is not the intent of the FDA to influence the civil tort liability of the manufacturer." 44 *Fed.Reg.* 37,437 (1979). In light of that unequivocal statement, we are unpersuaded that the asserted interest in rational prescribing precludes imposition of liability. Lederle's correspondence and internal documents establish that it knew or believed that there was an adverse causal association between Declomycin and tooth-staining. Lederle knew or believed that a portion of Declomycin users would be permanently injured by using the product as marketed. We are convinced that marketing Declomycin with that knowledge and belief constitutes the very conduct that the FDA intended not to absolve.

Finally, we note that Dr. Goddard testified that a manufacturer remained free to choose not to distribute a drug, an option cited in *Dewey* and *Ferebee* as additional support for a finding of no conflict. Lederle believed that a warning was necessary and proper for Declomycin. We find no basis to conclude that the FDA through its regulations mandated that Lederle disregard its determination and continue to produce a drug that it believed to be unsafe as distributed. The testimony of Dr. Goddard persuasively suggests a contrary conclusion. Irrespective of what the regulations may have required with regard to changes in labeling, we find no basis for concluding that Lederle was required to continue marketing Declomycin in forms and packaging intended for use by those it believed to be at risk—or indeed to continue marketing at all. Such a require-

ment would conflict with the predominant, express purpose for which the FDA was created and for which the new drug regulations were enacted.

We also note that Lederle is not faced with the Hobson's choice of either complying with federal regulations and continuing to be subject to damages in state tort actions or providing additional warnings and thereby violating federal law. The regulations in question have long since been changed expressly to allow pharmaceutical companies to implement necessary changes in labeling while a supplemental new-drug application is pending. See 30 *Fed.Reg.* 993 (1965). Furthermore, the present regulations governing labeling of prescription drugs require that the labeling "describe serious adverse reactions and potential safety hazards, [and] limitations in use imposed by them." 21 *C.F.R.* § 201.57(e) (1990). Interestingly, that provision states that "labeling shall be revised to include [such] a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." *Ibid.*

The issue then is what choices, if any, did Lederle have in 1962 and 1963. Even if we assume Lederle could not have provided a warning, an assumption we find unsupported by the evidence, it could have suspended production of Declomycin for what it termed the "probably * * * short period of time" before which Lederle anticipated that that drug too would be "officially implicated with tooth staining." Alternatively, Lederle could have quite reasonably and responsibly removed from the market those forms and methods of packaging of Declomycin that were geared toward pediatric use. It could have raised the price as a form of loss-spreading insurance against claims. Lederle also could have continued to press for FDA approval of a warning for Declomycin after the administration's initial response declining to change its official position. (The record is conspicuously silent on any continuing efforts by Lederle to confirm the association of Declomycin with tooth staining or to gain FDA sanction of a warning for Declomycin. *Cf. Feldman*

I, *supra,* 97 *N.J.* at 453, 479 *A.*2d 374 ("at least in some fields, such as those impacting on public health, a manufacturer may be expected to be informed and affirmatively to seek out information concerning the public's use of its own product").) The suggestion that Lederle was in some way compelled to continue distributing a drug without warning of the strong likelihood of serious side effects for some child users and that Congress and the FDA intended that it would be immune from liability for doing so cannot be reconciled with the primary purpose of the FDA to promote and protect the health of the citizens of the United States.

We find nothing in the record to justify a belief that Declomycin was different from the other tetracycline analogues in such a way that the discoloration side effect was unlikely to materialize. In fact, Lederle believed the evidence respecting Declomycin to be inevitably forthcoming "within a short period of time." The obvious reason for the lack of sufficient information on Declomycin was that Declomycin had been developed and introduced to the market later than the other members of the family of tetracyclines. The nature of the side effect precluded conclusive scientific information from being available until the permanent teeth of pediatric patients began to erupt. The issue, then, was not *whether* there would be evidence of tooth discoloration associated with Declomycin sufficient to justify the FDA in requiring a warning, but rather *when* such evidence would be available.

Simply stated, immunizing a drug manufacturer against liability for marketing a product without a warning of a known or knowable risk is in conflict with Congress' well-recognized purpose in enacting the FDCA, particularly as amended in 1962. We will not recognize such an anomalous claim of immunity based solely on a manufacturer's representations of the industry's belief. Here the evidence was conclusive that tetracycline analogues were not safe for children and that all other tetracyclines in existence long enough to provide data did not furnish adequate information as labelled previously. The exclusion of

Declomycin from the group approved for a label change was an unfortunate turn of events. We decline to visit the harm inflicted by a product on an innocent end-user by holding as a matter of law that Congress and the agency charged with protecting the public health intended to absolve from liability a manufacturer aware of the risk of that very harm.

We recognize that (assuming the price of Declomycin did not already include a "buffer factor" for unforeseen costs, an uncompelling assumption at best) Lederle might have had to increase the price of the product in order to absorb and spread the cost of the harm. So be it. Unlike the vaccines reviewed by the dissent, see *post* at 134–137, 592 *A*.2d at 1185–1187, Declomycin was not a wonder drug, without substitute or equipollent. The FDA "determination" in this case was really a non-decision—namely, that the evidence was not yet unequivocal or "substantial" as defined in the FDCA. It does not reflect a carefully-considered risk-benefit analysis of Declomycin's utility such that it should shield Lederle from plaintiff's claims for the harm caused by Declomycin. Lederle, believing that a warning would soon be required and that pediatric use of Declomycin would have harmful side effects, could not reasonably sit idly by, immunized from responsibility for those anticipated repercussions by legislation intended to promote the public health. See *MacDonald v. Ortho Pharmaceutical Corp., supra,* 394 *Mass.* 131, 475 *N.E.*2d 65.

## IV

The record does not contain any formal administrative decision demanding deference from this Court. *See Young v. Community Nutrition Inst.,* 476 *U.S.* 974, 106 *S.Ct.* 2360, 90 *L.Ed.*2d 959 (1986). The subsequent amendments relied on so heavily by Lederle are susceptible of varying interpretations supporting both parties' positions. A finding of direct conflict is not compelled. This Court will not seek out a basis for such

a finding. *See English v. General Elec. Co., supra,* —— *U.S.* at
——, 110 *S.Ct.* at 2280, 110 *L.Ed.*2d at 81.

The presence of the following factors reinforces the tradition-
al presumption against preemption: that there was no explicit
provision for preemption of state tort claims; that the subject
matter infringes on the State's inherent powers to protect and
promote the health and safety of its citizens; and that preemp-
tion would effectively eliminate all means of recourse for the
plaintiff. *See Dewey, supra,* 121 *N.J.* at 84–85, 577 *A.*2d 1239;
*Forster v. R.J. Reynolds Tobacco Co.,* 423 *N.W.*2d 691 (Ct.App.
1988), *aff'd in part and rev'd in part,* 437 *N.W.*2d 655 (Minn.
1989). If there had been a need to immunize prescription drug
and antibiotic manufacturers from tort liability, the determina-
tion of that need should have been "made by Congress in an
unambiguous mandate and *not* by the courts." *Forster, supra,*
423 *N.W.*2d at 701. To date Congress has not seen fit to
express such a mandate. We will not do so in its stead.

## V

 As a final point in opposition to this appeal, Lederle
raises the contention that "[i]f this case were again retried,
there is no way that plaintiff could prevail." Lederle bases
that contention on the hopeful conclusion that the rebuttable
presumption created by *N.J.S.A.* 2A:58C–4 will be conclusive on
remand. We believe Lederle overstates the import of the
statute.

Section four of the Products Liability Law, *N.J.S.A.* 2A:58C–
4, creates a rebuttable presumption that a warning or instruc-
tion is adequate "if the warning or instruction given in connec-
tion with a drug * * * has been approved or prescribed by the
federal Food and Drug Administration." The section also de-
fines adequate warning as follows:

> An adequate product warning or instruction is one that a reasonably prudent
> person in the same or similar circumstances would have provided with respect
> to the danger and that communicates adequate information on the dangers and
> safe use of the product, * * * in the case of prescription drugs, taking into

account the characteristics of, and the ordinary knowledge common to, the prescribing physician. [*Ibid.*]

Because the legislation affects the weight to be given FDA approval but does not change the burden of proof, it would apply to this cause on remand. *N.J.S.A.* 2A:58C–1 (section 8, not codified, provides for immediate effect); *see Shackil v. Lederle Laboratories,* 116 *N.J.* 155, 214, 561 *A.*2d 511 (1989) (O'Hern, J., dissenting).

The actual effect of the statute, however, is less clear. Its plain language defies the conclusion that the presumption cannot be overborne. Once the determination goes to the jurors, irrespective of an instruction from the court, they are free to disregard evidence of "approval" by the FDA. *Cf. McCormick on Evidence* § 344, at 978–79 (E. Cleary 3rd ed. 1984) (discussing instructions to jury when there is a presumption). Moreover, the statutory provision was enacted in the context of present FDCA, PHSA, and regulatory provisions that explicitly require warning of possible adverse side effects as soon as reasonably feasible and based on "reasonable evidence." *See* 21 *C.F.R.* § 201.57(e) (1990). Consequently, under the unique circumstances of this case, compliance with the "determination" of the FDA not to require a warning for Declomycin due to the lack of "unequivocal factual evidence of adverse reaction in man," although evidence of the adequacy of the labeling, should not be accorded the same presumptive weight now given to warnings approved or prescribed by that agency, and certainly does not create a conclusive presumption that the labeling contained an adequate warning.

## VI

We hold that Lederle has failed to establish that civil tort liability is precluded because of an actual conflict with federal law and regulations. The case is remanded to the Appellate Division for consideration of those issues raised before that court but not addressed by it.

GARIBALDI, J., dissenting.

The majority's narrow view of this case and the role of the Food and Drug Administration (FDA) prevent it from understanding the untoward implications its decision could have on the health of the many members of our society other than Carol Ann Feldman. The process that allows a prescription drug to be developed, tested, and marketed involves a complex balancing of the medical needs of everyone in our society against the risk that such drugs may present to any one person in that society. The majority's opinion upsets that balance.

Bad public policy emerges from the majority's intrusion into the field of prescription drug regulation. Its decision jeopardizes research and development of new drugs. It also will increase the cost of marketed drugs, thus escalating the nation's already spiraling health-care costs. Pharmaceutical manufacturers will be reluctant to develop and market drugs, in some instances, either withholding or withdrawing them from the market. People who need the drugs will be deprived of them because they are either not available or too expensive. Either way the public suffers. For those reasons, and because I am convinced that the majority introduces an unnecessary and unreasonable degree of confusion in this highly regulated area, I dissent.

I

Congress gave the FDA an explicit mandate "to act as *both* a public health *promoter* by facilitating the approval of important new safe and effective therapies, *and* as a public health *protector*, by keeping off or taking off the market drugs not shown to meet safety and efficacy standards." 50 *Fed.Reg.* 7452 (1985) (emphasis added). The FDA's mission is to ensure that each drug's "benefits outweigh its risks." *Id.* at 7469. The FDA must balance the "expected therapeutic gains" of each drug against the "risks entailed by its use." *United States v. Rutherford*, 442 *U.S.* 544, 555, 99 *S.Ct.* 2470, 2477, 61

*L.Ed.*2d 68, 79 (1979). The FDA cannot fulfill its role if state courts are allowed to require certain actions by pharmaceutical manufacturers that are prohibited under federal law and that supplant, rather than supplement, the carefully-considered regulations of a federal government agency. *See* Rose–Ackerman, *Tort Law in the Regulatory State,* in P. Schuck, *Tort Law and the Public Interest: Competition, Innovation and Consumer Welfare* 80, 100 (1991) (hereinafter Ackerman) ("Retaining conventional tort actions in the face of regulatory statutes can undermine the behavioral impact of. [those] statutes.").

To enable the FDA to make those risk-utility determinations, Congress gave control to the FDA over virtually "every aspect of drug formulation, production, testing and labeling." Comment, *Federal Preemption of Prescription Drug Labeling,* 22 *J. Marshall L.Rev.,* 629, 656 (1989) (hereinafter Comment, *Federal Preemption* ). The FDA promotes and protects health through a pervasive regulatory system that is exacting and time consuming. Even today "[p]harmaceutical product development is a long, tedious and expensive process * * * development time now averages twelve years." Comment, *Developing, Testing and Marketing An AIDS Vaccine: Legal Concerns for Manufacturers,* 139 *U.Pa.L.Rev.* 1077, 1083 (1991) (hereinafter Comment, *Legal Concerns for Manufacturers).*

In making its risk-utility analysis the FDA relies on a greater accumulation of information and expertise about the subject drug than can be found anywhere else. "The FDA has developed the highest level of competence in pharmaceutical investigation in the world." Comment, *Federal Preemption, supra,* 22 *J. Marshall L.Rev.* at 629. As was noted in 1967,

[t]oday, side-effect data from numerous sources feeds into the FDA's Information Center on Adverse Reactions and Hazards, where it is studied and catalogued. Some 6600 hospitals supply the FDA with drug information. The agency also collaborates with the AMA central registry of adverse reactions, which receives drug news from hospitals not reporting to the FDA and from doctors in private practice. All federal medical services and agencies send side-effect reports to the FDA, and eight countries will exchange information through an international center created by the World Health Organization to

provide a worldwide early warning system for new drugs. [Ruge, *Regulation of Prescription Drug Advertising: Medical Progress and Private Enterprise*, 32 *Law & Contemp. Probs.* 650, 659–60 (1967).]

*See also* 50 *Fed.Reg.* 7476–77 (1985) (calling for physicians to provide the FDA with direct information concerning suspected adverse reactions to drugs by means of form called Drug Experience Report (DER) or Form 1639). In addition to reaching out for such information, the FDA investigates and prosecutes violations and publishes "monthly reports on adverse reactions and a weekly journal of literature abstracts, which are sent to competing hospitals and other groups." Ruge, *supra*, 32 *Law & Contemp. Probs.* at 660.

"[B]ecause drug labeling is intended to advise health care professionals about potential hazards in the use of a drug and convey documented statements about its safety," 44 *Fed.Reg.* 37,447 (1979), the FDA also makes a risk-utility determination about drug labeling. Because of its importance, drug "labeling" is expansively defined and extensively regulated by the FDA.

"Labeling" is defined to include "all labels or other written, printed, or graphic matter" on the container or "accompanying such article." 21 *U.S.C.A.* § 321(m). " '[A]ccompanying such article" means any information that "supplements or explains' " the labeling and "[n]o physical attachment one to the other is necessary." *Kordel v. United States*, 335 *U.S.* 345, 350, 69 *S.Ct.* 106, 110, 93 *L.Ed.* 52, 57, *reh'gs. denied*, 335 *U.S.* 900, 69 *S.Ct.* 298, 93 *L.Ed.* 435 (1948), and 336 *U.S.* 911, 69 *S.Ct.* 513, 93 *L.Ed.* 1075 (1949). The "textual relationship" of the communication to the article is what is significant. *Ibid.* Thus, package inserts and all other communications to physicians with respect to the use or safety of the drug are considered to be "labeling" subject to FDA approval.

Even today, the FDA allows "labeling statements with respect to safety [only] if they are supported by scientific evidence," 44 *Fed.Reg.* 37,441 (1979). It demands that the "pharmacological information" in the label be "clinically relevant,"

*id.* at 37,442, and warn only of "known hazards and not theoretical possibilities." 21 *C.F.R.* § 201.57(d) (1991). The FDA has determined that a warning may not include a "statement of differences of opinion with respect to warnings (including contraindications, precautions, adverse reactions, and other information relating to *possible product hazards*) required in labeling food, drugs, devices, or cosmetics under this act," 21 *C.F.R.* § 1.21(c) (1991) (emphasis added). Simultaneously, following its "long-standing agency policy," the FDA demands that drug manufacturers continuously report to the FDA any unexpected or new side-effects, adverse reactions, or toxicity, "whether or not considered to be caused by the drug in question." 50 *Fed.Reg.* 7476 (1985). The FDA decision that a drug label is *"an authoritative document which contains only those indications and usages which are based upon substantial evidence,"* 40 *Fed.Reg.* 15,394 (1975) (emphasis added), reflects a conscious policy choice that certain information it gathers not be included in drug labeling.

Despite their portrayal by the majority, today's prescription drug manufacturers enjoy only a "very limited freedom," a freedom not enjoyed at all before 1965, to make temporary, conditional labeling changes. Note, *Federal Preemption: A Vaccine Manufacturer's Defense,* 56 *U.Mo.–K.C.L.Rev.* 515, 529 (1988) (hereinafter Note, *A Vaccine Manufacturer's Defense*). Even that freedom evaporates once the FDA has ruled. *See ibid.* The FDA must enforce its best assessment of the proper risk-benefit balance because of the unique concerns associated with pharmaceuticals.

Prescription drugs are unlike typical consumer goods, on which stringent warnings of possible dangers have no appreciable negative impact on the utility and use of the product and should rarely be omitted. *See, e.g., Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 242, 432 *A.*2d 925 (1981). Pharmaceuticals also differ from some other products, such as cigarettes, for which a negative impact on "utility" or use is not only a tolerated byproduct of a warning but often a targeted goal.

See, e.g., *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 100, 577 *A.*2d 1239 (1990) (noting legislative attempts to discourage smoking); *see also* Recent Development, *Tort Law—Strict Products Liability—New Jersey Supreme Court Preserves Claims Against Tobacco Companies—Dewey v. R.J. Reynolds Co., 121 N.J. 69, 577 A.2d 1239 (1990)*, 104 *Harv.L.Rev.* 1723, 1727 (1991) ("A second defense of strict liability * * * argues that forcing the industry to internalize the health costs of smoking will raise cigarette prices and thus encourage smokers to cut back or quit.") Despite those differences the majority's analysis proceeds uninfluenced by the conflicting policy considerations this case presents.

The uses and benefits of prescription drugs like Declomycin, and the analysis of those uses and benefits, differ markedly from an appraisal of the social benefits of paint mixers or cigarettes. *See Brown v. Superior Court*, 44 *Cal.*3d 1049, 1063, 751 *P.*2d 470, 478–79, 245 *Cal.Rptr.* 412, 420 (1988) (decision in any given pharmaceutical case must recognize and reflect broad policy considerations occasioned by "important distinction between prescription drug and other products"). Warning of the possible but not scientifically-verifiable side-effects of prescription drugs can have a significant anti-utilitarian effect, especially if required only in certain states. *Cf. ibid.* ("broader public interest in availability of drugs at affordable prices must be considered in deciding appropriate standards of liability for injuries resulting from their use" because beneficial drugs are necessary despite fact that "harm to some users is unavoidable"). As the FDA has said, "[t]o permit or require statements of conflicting opinion on all these matters would destroy the present usefulness of prescription drug labeling." 39 *Fed.Reg.* 33, 232 (1974). It would also destroy the FDA's hope of " 'bringing consistency and uniformity to the marketplace' " or of succeeding in its " 'well-established policy of promoting uniformity in the area.' " *See* Comment, *Legal Concerns for Manufacturers, supra,* 139 *U.Pa.L.Rev.* at 117 n.

190 (quoting 51 *Fed.Reg.* 8181 (1986), and 50 *Fed.Reg.* 51,403 (1985), respectively).

The FDA has expressed two serious concerns about drug labeling. First, it has an interest in "rational prescribing," *i.e.*, ensuring that the risks and benefits of a particular drug be fairly presented so that a physician can compare them with other available therapies. That goal is not advanced if a drug is made to appear riskier than other drugs and other therapies due to the over-dramatization of risk information. To allow a warning based on inconclusive evidence or scientific hunches results in doctors not prescribing effective drugs to a patient because of the erroneous belief that a side-effect might occur.

In addition to promoting "rational prescribing," the FDA must prevent "information overload." As one court has noted:

> The quality of evidence supporting a causal connection between product and injury may change from extremely vague to highly certain. * * * [I]f every report of a possible risk, no matter how speculative, conjectured, or tentative, imposed an affirmative duty to give some warning, a manufacturer would be required to inundate physicians indiscriminately with notice of any and every hint of danger, thereby inevitably diluting the force of any specific warning given. [*Finn v. G.D. Searle & Co.*, 35 *Cal.*3d 691, 701, 677 *P.*2d 1147, 1153, 200 *Cal.Rptr.* 870, 876 (1984).]

The FDA has legitimate concerns that information overload may lead physicians to ignore drug labels or package inserts or to read them without any intention of modifying their prescription practices because substantial parts of what they have found in them in the past had not been useful or had later been disproved. *See* Note, *A Question of Competence: The Judicial Role in the Regulation of Pharmaceuticals*, 103 *Harv. L.Rev.* 773, 783 (1990) (hereinafter Note, *Pharmaceutical Regulation*).

The FDA has an interest in promoting health. Ensuring that drug scares do not occur and that unsubstantiated claims, good or bad, do not appear on the label is a way of achieving that goal. Even today, under 21 *C.F.R.* § 310.303(a) (1991), the FDA receives information regarding every possible side-effect, but issues warnings based only on "substantial evidence,"

because "statements of conflicting opinion * * * would destroy the present usefulness of prescription drug labeling." 39 *Fed. Reg.* 33,232 (1974). That policy balance represents the expert appraisal of how best to maximize aggregate health benefits. The dual function of the FDA ensures that drug companies produce and market medications that "decrease aggregate health risks as safely and inexpensively as possible," Note, *Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 780, because "Americans insist on the best available medications to treat those suffering from illness." Comment, *Federal Preemption, supra,* 22 *J. Marshall L.Rev.* at 629.

Against that background, we review this case.

## II

### —A—

I agree with the Appellate Division. Although the comprehensive nature of FDA regulations and the national goal of uniformity in drug labels tempts me to find implied preemption, I need not reach that issue here. The Appellate Division's narrower holding disposes of this case and addresses those concerns that force me to disagree with my colleagues:

> We conclude that the Food and Drug Administration's (FDA) regulation of the drug industry does not warrant a finding of implied federal preemption of all State tort claims grounded in strict liability failure to warn. However, under certain circumstances, such as presented here, federal law may preempt a discrete issue upon which liability is predicated because compliance with State decisional law would require federal law to be violated. [234 *N.J.Super.* at 564, 561 *A.*2d 288.]

"[E]ven in the absence of express language on implied congressional intent to occupy the field, state law may be preempted 'to the extent that it actually conflicts with federal.'" *Dewey, supra,* 121 *N.J.* at 78, 577 *A.*2d 1239 (quoting *Brown v. Hotel Employees Int'l Union,* 468 *U.S.* 491, 510, 104 *S.Ct.* 3179, 3190, 82 *L.Ed.*2d 373, 383 (1984)). Federal regulations have the same preemptive effect as federal statutes, *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471

*U.S.* 707, 713, 105 *S.Ct.* 2371, 2375, 85 *L.Ed.*2d 714, 721 (1984), and state common law and state statutory law stand equally subject to preemption. *Chicago N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 *U.S.* 311, 325–26, 101 *S.Ct.* 1124, 1134, 67 *L.Ed.*2d 258, 270 (1981).

I agree with the Appellate Division that the "clear wording" of the regulations in place before 1965 prevented the defendant, Lederle Laboratories, from complying with the common-law duty this Court now imposes on it. 234 *N.J.Super.* at 588, 561 *A.*2d 288; *see Roginsky v. Richardson–Merrell, Inc.*, 378 *F.*2d 832, 835, 848 (2d Cir.1967) (interpreting pre–1965 regulations to require prior FDA approval before a labeling change could be made); *Miller v. Upjohn Co.*, 465 *So.*2d 42, 45 (La.Ct.App.1985) (same), *cert. denied*, 467 *So.*2d 533 (1985) (same); *see also Hurley v. Lederle Laboratories*, 863 *F.*2d 1173, 1179, *modifying* 851 *F.*2d 1536, 1542 (5th Cir.1988) (because it is "[m]ost important [that] the manufacturers cannot change the language in the product insert without FDA approval," court found that direct conflict preempted adequacy of warning issue as long as Lederle had met its duty to disclose all relevant information to FDA).

The plain wording of the two regulations relevant here support that position. The first, 21 *C.F.R.* § 130.9(a) (1960), states in part:

A supplemental application should be submitted for any change beyond the variations provided for in the application * * * that may alter the conditions of use, the labeling, the safety, identity, strength, quality or purity of the drug * * *. Labeling changes include deviations from the authorized brochure in any mailing or promotional piece used after the drug is placed on the market. When necessary for the safety of the drug, a supplemental application may be required to specify a period of time within which the proposed change will be made; and in such case the distribution of the drug after such time without such change constitutes distribution without an effective new-drug application. If a material change is made in the * * * labeling or advertising[ ] from the representations in an effective application for a new drug, and the drug is marketed before a supplement is effective for such change, the application may be suspended under § 130.27 on the grounds that it contains an untrue statement of a material fact.

The other regulation of primary relevance, which defined the FDA's position on the certification of batches of antibiotics, stated:

(b) A certificate shall cease to be effective:

\* \* \* \* \* \* \* \*

(2) With respect to any immediate container \* \* \* when its label or labeling is altered, mutilated, destroyed, obliterated, or removed in whole or in part, or ceases to conform to any labeling requirement prescribed by the regulations in this part, except that:

(i) If the drug in such container is repacked \* \* \*, and certification of the batch thus made is requested, such certificate shall continue to be effective for a reasonable time \* \* \*; [or]

\* \* \* \* \* \* \* \*

(iii) If its label or labeling is removed in whole or in part for the purpose of relabeling and supplemental certification of the relabeled drug is requested, as provided by § 146.18. [21 *C.F.R.* § 146.4 (1955).]

Each of those regulations clearly indicates the need to obtain approval before altering labels. *See* L. Tribe, *American Constitutional Law* § 6–26 at 482 (1988) (Implication can still amount to direct preemption because "state and federal law need not be contradictory on their face for the latter to supercede the former. There are more subtle forms of actual conflict.").

Subsequent history also discloses that Lederle could not alter its label without approval under the FDA regulations governing changes in drug labeling in effect during 1962 and 1963. In January 1965, the FDA amended the form of the New Drug Application prescribed in 21 *C.F.R.* § 130.4 (1956), and the requirement of filing a supplemental application set forth in 21 *C.F.R.* § 130.9 (1960), to allow a manufacturer to incorporate additional warnings of side-effects in its labeling prior to receiving a written notice of approval of the supplemental new drug application from the FDA. *See* 30 *Fed.Reg.* 993 (1965). In *Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 479 *A.*2d 374 (1984) (*Feldman* I) we mistakenly suggested, on an incomplete record, that those amendments might have merely clarified existing procedures. *Id.* at 459, 479 *A.*2d 374. We know now

that that is not so. The former Commissioner of the FDA explained that the regulations were "amended * * * *to enable* prompt adoption of changes," and that the amendments were intended to *"relax* existing requirements." 30 *Fed.Reg.* 993–94 (1965) (emphasis added).

History is particularly telling in the case of antibiotics. Although Congress immediately recognized that antibiotics "are spectacularly efficacious in many serious diseases suffered by large numbers of our population," it was very concerned about the complicated manufacture and safe use of antibiotics. *Hearings Before a Subcommittee of the House Committee on Interstate and Foreign Commerce,* 81st Cong., 1st Sess. 5 (1940). Accordingly, Congress imposed on antibiotics "even more stringent regulations" than those generally imposed on prescription drugs. *See Pfizer, Inc. v. Richardson,* 434 *F.*2d 536, 538 (2d Cir.1970). After the initial approval of an antibiotic, but not other drugs, the manufacturer was required to request certification of each batch before it was marketed. *See* 21 *C.F.R.* §§ 146.2 & 146.3 (1963). Thus, before a batch of antibiotic could be certified, the FDA was required to find affirmatively that the labeling did not contain any "untrue statement of a material fact," that it contained "all words, statements, and other information required by the regulations," and that it otherwise met all the statutory standards for *adequate* warnings. *See* 21 *C.F.R.* §§ 146.3 & 146.4 (1963).

Moreover, the FDA precluded drug manufacturers from altering approved labeling in any respect without prior authorization. The certification of any batch of antibiotics was immediately void if the "labeling [had been] altered * * * in whole or in part, or [had ceased] to conform to any labeling requirement." 21 *C.F.R.* § 146.4(b)(2) (1963). Even the 1965 amendments did not change the batch certification requirements applicable to antibiotics. Only in 1966 did the FDA modify its antibiotic regulations to allow manufacturers to use "mailing and promotional pieces that are essentially the same as the previously approved labeling" without "advance approval" from

the agency. 31 *Fed.Reg.* 11,415 (1966). In explaining that change, the then-Commissioner of FDA stated that "heretofore, the regulations have *required specific advance approval* of each mailing piece." *Ibid.* (emphasis added). Except for that minor change, however, the FDA approval procedures for changes in antibiotic labeling remained intact.

The FDA's intent to prevent pharmaceutical manufacturers from changing drug labels without the FDA's approval is confirmed by the regulations. *See Grove City College v. Bell,* 465 *U.S.* 555, 567, 104 *S.Ct.* 1211, 1218, 79 *L.Ed.*2d 516, 528 (1984). The 1965 amendments "relaxe[d]" existing standards and "enable[d]" manufacturers to take previously-prohibited actions. *See* 30 *Fed.Reg.* 993–94 (1965). Neither did the FDA then, nor does it now, believe "warning of *possible* dangerous side effects * * * [to be] consistent with its primary purpose." *Ante* at 149–50, 592 *A.*2d at 1193–94 (emphasis added). Labels should warn only of *"known* hazards and *not theoretical possibilities,"* 21 *C.F.R.* § 201.57(d) (1991) (emphasis added), and these "warnings" should describe only those "adverse reactions" and "safety hazards" that have a demonstrated "association" with the subject drug. 21 *C.F.R.* § 201.57(e) (1991).

—B—

The facts also support the position that if Lederle had placed on its label for Declomycin the additional warning now required by the majority, it would have been in direct conflict with the FDA's strict drug-labeling regulations.

I agree with much of the majority's discussion of the facts, including the observation that the ingestion of Declomycin during the developmental stages of plaintiff's teeth caused the injury alleged here. However, I highlight those facts that are most salient to the present inquiry.

Tetracyclines, a generic label for a group of antibiotics, of which Declomycin is one,[1] marked a great advance in the fight

against bacterial infections. *See United States v. An Article of Drug*, 394 *U.S.* 784, 785, 89 *S.Ct.* 1410, 1411, 22 *L.Ed.*2d 726, 729 (1969) (describing tetracyclines as "wonder drugs"). "A primary benefit of tetracyclines is that they are effective against a wider variety of organisms than are other antibiotics." *Ante* at 122–23, 592 *A.*2d at 1178–79.

> Declomycin "had greater antibiotic potency that made it possible to achieve therapeutic activity with less weight of antibiotic," * * * it had "a reduced renal clearance rate that produced a prolongation of the antibacterial level in the body," and * * * it was "therapeutically equally effective as other tetracyclines in infections caused by organisms sensitive to the tetracyclines." [*Ibid.* (quoting *Feldman* I, *supra*, 97 *N.J.* at 436, 479 *A.*2d 374.)]

Those proven qualities made Declomycin a beneficial addition to medical-treatment programs throughout this country when it was introduced in 1959.

In 1962, defendant began to receive anecdotal reports regarding a possible link between the use of tetracycline by children during their developmental years and the subsequent yellowing of some users' teeth. Lederle quickly notified the FDA of the possible link and proposed a warning label. The FDA responded that it had been "devoting a great deal of attention to the matter" over "the past several months." Letter from FDA to Lederle (Dec. 3, 1962). The FDA had received reports "of this type from here and abroad," and, although it was "acutely interested" in the problem and was "fully aware of the importance of the various implications of this problem," it did not order Lederle to augment or alter its current label. *Ibid.*

Defendant continued to supply information to the FDA during the agency's research on Declomycin. In early 1963, the FDA directed that a warning label be placed on certain tetracycline analogues to alert users to a demonstrated link between these drugs and tooth staining. The FDA had removed the generic label "tetracycline" from its proposed warning and

---

1Declomycin is the trade name used by Lederle for demethylchlortetracycline, a tetracycline analogue.

specifically excluded Declomycin because there was "practically no specific clinical evidence to substantiate such a labeling requirement." Thus, the FDA refused to approve immediately Lederle's desired warning for Declomycin's labeling, and it further forced Lederle to exclude its originally-approved blanket statement from Declomycin labeling because there was insufficient information to "substantiate" the clinical association necessary to support such a labeling requirement.

On April 18, 1963, the FDA issued the following press release to all medical and dental journals, and to the general media, with respect to tooth discoloration and tetracyclines. That release, in pertinent part, said:

'Children's teeth can be seriously discolored by three types of tetracycline antibiotics,' the Food & Drug Administration said in a message to physicians and dentists.

'The three drugs are: tetracycline, chlortetracycline, and oxytetracycline. *There is no evidence that a fourth drug, [Declomycin] causes the discoloration,' FDA said.* [emphasis added.]

Thus, if Lederle had issued the warning required by the majority, it would not only have proceeded without the FDA's approval of its desired warning, it also would have directly contradicted the public position of the FDA. *Cf.* L. Tribe, *supra,* § 6–26 at 483 (state law will be preempted "if its effect is to discourage conduct that federal action specifically seeks to encourage").

Accordingly, this record unambiguously demonstrates a direct conflict. The majority need not search it out. It emerges clearly from the totality of the evidence in this record.

—C—

The majority's opinion's assumptions and inferences have no basis in the record. The majority unfairly casts Lederle as a scheming dissembler that provided evasive answers and caused some sort of knowing delay in FDA decisions by suppressing information. Were that true, my position here might be different. *Cf. Silkwood v. Kerr–McGee Corp.,* 464 *U.S.* 238, 257, 104 *S.Ct.* 615, 626, 78 *L.Ed.*2d 443, 458 (1984) (when "federal

standards have been violated," paying both federal administrative fines and state tort damages does not "frustrate any purpose" of a pervasive federal scheme). I would not countenance a result that insulated a manufacturer who violated federal standards by delaying or disrupting, through action or inaction, the flow of information to the FDA, by refusing to investigate independently the possibility that its drugs were harmful, or by using administrative delay as an opportunity to unload on the public drugs known to be unsafe. *See Hurley, supra,* 863 *F.*2d at 1179–80.

However, nothing like that occurred here. Lederle violated no federal standards—indeed, Lederle went so far beyond mere adherence that it drew praise from the FDA. Although Lederle certainly had information implicating a potential connection between tooth staining and tetracyclines, no one, including the FDA, "could * * * come to any conclusions as to what exactly was going on," according to one witness. Another witness noted that Declomycin, unlike two other tetracycline analogues, had not been demonstrably linked to tooth discoloration by 1963. Another witness stated that Declomycin had "initially [been] thought to have even less effect on tooth staining than the original tetracyclines." Moreover, Lederle warned its sales staff not to use the FDA's exemption of Declomycin from its order for revised warnings to gain market advantage. I see no evasion in the answer "Declomycin has not *as yet* been *officially* implicated in tooth staining." (Lederle memorandum dated April 23, 1963) (emphasis added). Indeed, the modifying language "as yet" and "officially" indicates even to the most unsophisticated physician that that status might change. Despite that evidence, the majority makes the unsupported assumption that evidence that would have demonstrated a known hazard and not a theoretical possibility would "not then have been available to the FDA," *ante* at 126, 592 *A.*2d at 1181, yet existed for Lederle. Indeed, the record shows just the opposite. The FDA's information-gathering mechanisms were pervasive even in the 1960s—they reached into the experiences of manu-

facturers, hospitals, and doctors' offices. *See* Ruge, *supra,* 32 *Law & Contemp. Probs.* at 659–60. The evidence had not yet convinced the FDA; that does not mean that it was concealed from the FDA.

## III

The exclusion of Declomycin from the original list of tetracycline analogues that had to carry a label warning against tooth staining was not merely "an unfortunate turn of events." *Ante* at 155, 592 *A.*2d at 1196. It was a deliberate administrative response by the FDA. Available information did not substantiate such a labeling requirement.

The Court's single-case focus inevitably diverts any risk-benefit analysis away from the proper medication-market balance to an improper medication-patient one. Unlike cigarette cases, in which the offending substance provides neither society nor the individual with any appreciable medical benefit, pharmaceutical cases demand the most accurate risk assessment possible:

[I]n the event that the tort system fails to assess appropriately the relative risk calculus, and thereby deters the development, forces the removal, or skews the pricing of medications that lower aggregate harm, certain individuals will be unable to receive net beneficial medications. As such, total harm will increase. * * * Although the tort system undeniably provides the only compensation for some individuals, tort law in the pharmaceutical context distorts the availability and price of beneficial medications, thereby harming more individuals in the first instance. [Note, *Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 784–85.]

Announcing such fears is neither crying wolf nor aping Chicken Little. "The histories of Oculinum, Bendectin and DPT vaccine symbolize a developing crisis in health care." *Id.* at 775. The manufacturers of Oculinum could not obtain insurance on the drug, and hence it could not be marketed, despite six years of experimental success in treating eye problems. *Id.* at 774; *see also Brown, supra,* 44 *Cal.*3d at 1065, 751 *P.*2d at 480, 245 *Cal.Rptr.* at 421 ("a manufacturer was unable to market a new drug for the treatment of vision problems be-

cause it could not obtain adequate liability insurance at a reasonable cost"). The story of Bendectin illustrates how net health benefits can be evaporated by non-expert juries without any demonstrable basis.

Bendectin is a drug effective in remedying the difficulties of morning sickness. The drug continues to enjoy the approval of the FDA, and studies have consistently concluded that the drug is safe. Nonetheless, Bendectin became such a popular target for tort lawsuits alleging that it was responsible for birth defects that the drug's manufacturer withdrew it—the only available morning sickness medication—and submitted to a $120 million class action settlement. Although the manufacturer had not lost a case on appeal, "[s]ince even wins were only adding to the costs of defense, the company * * * decided to settle." [Note, *Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 774 (quoting "Morning Sickness, Legal Miscarriage," N.Y. Times, July 30, 1984, at A20, col. 1).]

The diphtheria-pertussis-tetanus (DPT) vaccine saga is a bit more complicated but no less revealing. At one time, pertussis, or whooping cough, "was a major cause of childhood morbidity and mortality in the United States." Note, *A Vaccine Manufacturer's Defense, supra,* 56 *U.Mo.–K.C.L.Rev.* at 519. It caused 36,013 deaths and over 800,000 cases between 1926 and 1930. *Ibid.* Because of the development and use of an effective vaccine, no more than 3,000 cases a year, and between five and twenty deaths a year, were reported from 1960 to 1982. However, the disease may ravage our children again—"skyrocketing litigation costs," *id.* at 516, prompted seven of the eight DPT vaccine manufacturers to withdraw from the market and caused the price per dose to rise from 11¢ to $11 between 1981 and 1986. Note, *Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 775 n. 10; *see also* Viscusi & Moore, "Rationalizing the Relationship Between Product Liability and Innovation," P. Schuck, *supra,* at 111. ("Rising liability costs" caused ten of the thirteen manufacturers of vaccines for five serious childhood diseases to cease production between 1981 and 1990). These are events with which we are familiar. *See Schackil v. Lederle Laboratories,* 116 *N.J.* 155, 178–80, 561 *A.*2d 511 (1989). Drug manufacturers refused to supply a newly discovered vaccine for influenza on the ground that mass innoculation

would subject them to enormous liability. The government therefore assumed the risk of lawsuits resulting from injuries caused by the vaccine. *See Feldman v. Lederle Laboratories,* 189 *N.J.Super.* 424, 435–36, 460 *A.*2d 203 (App.Div.1983); Franklin & Mais, *Tort Law and Mass Immunization Programs,* 65 *Calif.L.Rev.* 754, 769 (1977).

The majority's view of the issue of "what choices, if any, did Lederle have in 1962 and 1963," *ante* at 153, 592 *A.*2d at 1195, demonstrates its failure to understand the importance of risk-utility analysis in the development and marketing of prescription drugs. It determines that Lederle could have discontinued the production or raised the price to cover its potential liability. Ignored entirely in the majority's assessment is the effect the drug's removal from the market or its increased price will have on the numerous people who are helped by the drug. The majority does not consider the good the drug does, the lives it may save, or the suffering and pain it may prevent. The majority's suggestion that suspending production or raising the price of Declomycin in response to then-unverified possibilities ignores the widespread disutility of such practices, especially if the possibilities proved to be false alarms. Drugs would go unproduced or produced only at high prices: each prevents many in need from using them.

That is not an unrealistic appraisal. To assume or posit, as the majority does, that tort liability judgments do not have a profound regulatory effect on the prescription drug market is naive. As noted by the California Supreme Court, "the possibility that the cost of insurance and of defending lawsuits will diminish the availability and increase the price of pharmaceuticals is far from theoretical." *Brown, supra,* 44 *Cal.*3d at 1064, 751 *P.*2d at 479, 245 *Cal.Rptr.* at 421; *see also id.* at 1065, 751 *P.*2d at 480, 245 *Cal.Rptr.* at 421 (rejecting a failure-to-warn claim for the "same reasons of policy" that led court to reject strict liability). In *Shackil v. Lederle Laboratories,* we recognized the "important societal goals of maintaining an adequate supply of life-saving vaccines and of developing safer alterna-

tives to current methods of vaccinations." 116 *N.J.* at 190, 561 *A.*2d 511. In finding for the defendant, we stated that "our aim is not to insulate vaccine manufacturers from liability, but to acknowledge a painful reality—that the excessive exposure to liability * * * would inevitably discourage highly useful activity." *Id.* at 190–91, 561 *A.*2d 511. Whatever the validity of the "incidental effects" distinction of *Dewey, supra,* 121 *N.J.* at 90–94, 577 *A.*2d 1239, the examples of Oculinum, Bendectin, and DPT vaccine demonstrate that the prescription-drug market has directly felt the regulatory effect of the threat or payment of court-awarded damages. *Brown, supra,* 44 *Cal.*3d at 1064– 65, 751 *P.*2d at 479, 245 *Cal.Rptr.* at 421 (noting 300% increase in cost of Bendectin and "hundredfold" increase in price of DPT vaccine that paralleled increase in lawsuits from one in 1979 to 219 in 1985).

[T]he tort system undermines the availability of pharmaceuticals. Even in the absence of liability judgments, the mere fear of astronomical liability may render a drug uninsurable and consequently unmarketable. In the event that a beneficial drug does reach the market, but becomes the target of tort suits, litigation costs alone may force the manufacturer to withdraw its product. Moreover, actual or potential tort liability, even if it does not force the removal of a medication from the market can have marked effects on pricing and production. [Note, *Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 774–75.]

Awarding compensatory damages certainly does have a regulatory effect. *See Shackil, supra,* 116 *N.J.* at 190–91, 561 *A.*2d 511; *see also* Ackerman, *supra,* at 93 (if manufacturers surpass "the optimal agency standard" of care because of fear of damage awards, "marginal costs" of production will "exceed marginal benefits," producing "regulatory effect" from "purely compensatory damages").

Congress empowered the FDA alone to set that "optimal" level—*i.e.,* to make the necessary risk/benefit analysis involved in the marketing of prescription drugs. Congress understood that "there is no such thing as absolute safety in drugs." *Hearings on Drug Safety Before the Subcomm. on Intergovernmental Relations of the House Comm. on Government Operations,* 88th Cong., 2d Sess. 147 (1964) *quoted in* Note,

*Pharmaceutical Regulation, supra,* 103 *Harv.L.Rev.* at 773. Yet, Congress created and continued to support the FDA's regulatory approach. That approach calls for extensive pre-marketing testing and risk/benefit evaluation. It also demands that post-marketing information be gathered. That post-marketing information, however, will warrant a withdrawal or a conditioning of a drug's continued approval only if there is substantial evidence demonstrating the necessity of such action. That is an administrative decision based on a desire to increase the aggregate health benefits, and on a legitimate *ad hoc* risk assessment that holds that once an already-approved drug has proven sufficiently safe and efficacious in pre-market studies, the interest in health demands that it not be withdrawn or encumbered until substantial evidence exists.

A system in which we shun expertise, experience, and institutional purpose and instead allow a court to change drug labels after it "arrogates to a single jury the regulatory power explicitly denied to all the fifty states' legislative bodies" seems strange. *Fitzgerald v. Mallinckrodt, Inc.,* 681 *F.Supp.* 404, 407 (E.D.Mich.1987). Moreover, jury verdicts discourage the use of important drugs. Through the media, the public becomes aware of jury verdicts that frighten, and focuses its attention on the side-effects of the drug without any appreciation of its beneficial results.

## IV

Lederle proposed a change in the labeling of Declomycin to warn of possible tooth staining in November 1962, but the FDA did not believe that the evidence warranted such a change and refused to authorize it. In *Feldman* I, we wondered if "it would [not] seem anomalous for the FDA to have prevented a drug manufacturer from advising the public immediately of a newly discovered danger while waiting for FDA approval." 97 *N.J.* at 459, 479 *A.*2d 374. However, the more substantial record provided by this case demonstrates that there is nothing

at all anomalous about the FDA's position—there was no "newly discovered danger;" there was only a newly-suspected one.

In reviewing Lederle's November 1962 request to change the labeling of its tetracycline drugs to warn of possible tooth discoloration, the FDA balanced the substantial therapeutic benefits that those drugs had in the treatment of a wide range of bacterial infections against the scientifically-knowable risks of tooth staining in normal, healthy children. The FDA also considered the impact that that warning—if the suspicions about Declomycin proved to be unfounded—would have on rational prescribing and on the credibility of side-effect warnings generally. As stated by Dr. Barzilai of the FDA in his December 3, 1962, letter acknowledging Lederle's desire to change its Declomycin label, the issue had to be reviewed from a "medical, scientific [and] regulatory" point of view before the FDA could reach "any form of final opinion" on the matter.

What has happened in this case is that a lay jury was instructed by the trial court to second-guess freely those delicate scientific and policy judgments of the FDA from a vantage point twenty-five years later. The logic of giving judicial deference to the medical judgments of the FDA and the agency's own view of its statutory role in the drug-labeling process is even more compelling when the issue is the liability of an FDA licensee who has strictly complied with the agency's dictates, as occurred here.

The FDA, not courts, must determine the proper balance of risk and benefit and the necessary extent of any warnings. To make such broad judgments is peculiarly beyond the competence of courts. The FDA, not the courts, has the assets and abilities both to protect and to promote health. Indeed,

[s]ince 1938, Americans have looked to the FDA for assurance of quality in the medicines they take. Pursuant to this task, the FDA has developed the highest level of competence in pharmaceutical investigation in the world. Nevertheless, technically incompetent state court juries are continuing to usurp federal authority by rejecting FDA standards in product liability cases. [Comment, *Federal Preemption, supra,* 22 *J. Marshall L.Rev.* at 656.]

Many battles remain to be fought—for example, the fight against AIDS. *See* McKenna, *The Impact of Product Liability Law on the Development of a Vaccine Against the AIDS Virus*, 55 *U.Chi.L.Rev.* 943 (1988). "Drug availability and pricing policies may depend on the ability of manufacturers to limit their own liability. The consequences of these issues extend beyond the AIDS epidemic and influence the extent to which the drug development process will be able to respond to disease victims in the future." Comment, *Legal Concerns for Manufacturers, supra,* 139 *U.Pa.L.Rev.* at 1078. Those problems convince me we would be better to trust the decisions made by experts at the FDA rather than by health novices, such as jurors or judges.

"[I]mplicit in any decision to broaden liability in order to provide compensation is a judgment that the goals of public policy will likewise be served." *Shackil, supra,* 116 *N.J.* at 177, 561 *A.*2d 511. By holding Lederle liable despite its strict adherence to federal law, as understood and applied by the FDA at the time and despite Lederle's efforts quickly to bring to the attention of the FDA, all the information it had, and despite its cooperation in providing the public with all relevant, pharmacologically-significant, and verified information at the earliest possible date, the majority thwarts the important "societal goals [of] encouraging the use and development of needed drugs * * * in order to provide compensation to those injured by [Lederle's] products." *Id.* at 178, 561 *A.*2d 511.

Conveying useful, important information on drug labeling promotes a vital societal need: the safe and efficacious use of drugs. However, "[t]o permit or require statements of conflicting opinion on all these matters would destroy the present usefulness of prescription drug labeling." 39 *Fed.Reg.* 33,232 (1974). That statement shows that the FDA does not establish minimum standards—it establishes uniform ones. Today's decision requires a warning that the FDA would not permit. In early to mid–1963, available scientific knowledge had not reached a level that allowed Lederle or the FDA to present

anything other than a "conflicting opinion" regarding the potential effect of Declomycin on developing teeth. Because requiring or permitting such deviation "would destroy the present usefulness of prescription drug labeling," *ibid.*, I cannot join my colleagues.

V

Based on my analysis, a discussion of *N.J.S.A.* 2A:58C–4 is not necessary. Nonetheless, I add a few comments to indicate my disagreement with the majority's analysis of that statute.

The Legislature enacted *N.J.S.A.* 2A:58C–4 in a regulatory system that allows manufacturers to make conditional label alterations and additions. The effort to create a pro-manufacturer presumption evinces legislative recognition of precisely the concerns I have discussed throughout this opinion. Indeed, the primary motivating force behind *N.J.S.A.* 2A:58C–4 was an effort to restore some protection to a manufacturer's decision to conform to FDA labeling decisions, a protection stripped by overly-enthusiastic judicial expansions of the reasonable implication of the FDA's 1965 regulatory amendments. To carry out the goals of *N.J.S.A.* 2A:58C–4, the Legislature "establish[ed] clear rules," *Senate Judiciary Committee Statement, L.1987, c. 197, 202nd New Jersey Legislature, 2d. Sess., reprinted in* 1987 *New Jersey Session Law Service (No. 6)* 193, 194, created a strong presumption in favor of FDA decisions, *N.J.S.A.* 2A:58C–4, and limited the costs of litigation, *see N.J.S.A.* 2A:58C–5(c) (exempting FDA-approved drugs from punitive damages). All those goals undercut and contradict the majority's decision.

Moreover, the majority's analysis of the specific facts of this case is flawed. Preemption in this case presupposes the pre–1965 world in which Lederle could not have changed its Declomycin label in any way without prior FDA approval, whereas the statutory presumption presupposes the post–1965 world in which Lederle has a limited freedom to make conditional altera-

tions or additions pending a dispositive FDA ruling. The majority draws from that distinction the conclusion that

> under the unique circumstances of this case, compliance with the 'determination' of the FDA not to require a warning for Declymycin due to the lack of 'unequivocal factual evidence of adverse reaction in man,' although evidence of the adequacy of the labeling, should not be accorded the same presumptive weight now given to warnings approved or prescribed by that agency, and certainly does not create a conclusive presumption that the labeling contained an adequate warning. [*Ante* at 157, 592 *A*.2d at 1197.]

I agree—it should be given more.

Today's manufacturers have the limited freedom to enhance the warning they give. Concomitantly, they can be held accountable for failure to exercise that freedom when it would have been reasonable to do so. Seeking "to establish clear rules with respect to specific matters as to which decisions of the courts in New Jersey have created uncertainty," *Senate Judiciary Committee Statement, Senate No. 2805—L.1987, c. 197," supra, reprinted in* 1987 *New Jersey Session Law Service (No. 6)* at 194, the Legislature made it presumptively reasonable not to exercise that freedom to enhance a label already approved by the FDA. A pre–1965 manufacturer had no similar freedom. Consequently, it could not be held liable for failure to exercise a then-nonexistent freedom. In that context, the presumption is so strong we call it preemption.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*Dissenting*—Justice GARIBALDI—1.